[No. D006647. Fourth Dist., Div. One. Aug. 17, 1988.]

SAN DIEGO GAS & ELECTRIC COMPANY, Plaintiff and
Appellant, v.
SAN DIEGO COUNTY AIR POLLUTION CONTROL DISTRICT
et al., Defendants and Respondents;
INDUSTRIAL ENVIRONMENTAL ASSOCIATION OF SAN
DIEGO COUNTY et al., Interveners and Appellants.

COUNSEL

Lisa C. Anderson, Timothy W. Tower and Michael R. Weinstein for Plaintiff and Appellant.

Lloyd M. Harmon, Jr., County Counsel, Daniel J. Wallace, Chief Deputy County Counsel, and Barbara Baird, Deputy County Counsel, for Defendants and Respondents.

James L. McBride, County Counsel (Ventura), and James W. Thonis, Assistant County Counsel, as Amici Curiae on behalf of Defendants and Respondents.

Latham & Watkins, David L. Mulliken, Christoper W. Garrett, Timothy C. Stutler, Stephen McConnell, Kristine L. Wilkes and Laurens H. Silver for Interveners and Appellants.

## OPINION

WORK, J.— In this case we hold the San Diego County Air Pollution Control District (district or APCD) may recover actual costs of operation which are not reasonably identifiable with specific industrial polluters (indirect costs) by apportioning them among all monitored polluters according to a formula based on the amount of emissions discharged by a stationary pollution source. In reaching this result, we find the "emissions-based" formula adopted by the district is neither a prohibited "special tax" (see Cal. Const., art. XIII A, § 4 (Prop. 13)) nor beyond the district's statutory authority. For the following reasons we affirm the judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

San Diego Gas & Electric Company (SDG&E)[1] unsuccessfully petitioned for mandate challenging a change in the San Diego County APCD's method of apportioning the costs of its permit programs among stationary sources of pollution required to obtain operating permits under Health and Safety Code[2] section 42311. As explained more fully below, section 42311 was amended in 1982 to allow a local air pollution control district to fully (rather than partially) recover the costs of its permit programs through permit fees, with a view to decreasing the district's reliance on government funding.[3] The APCD incrementally implemented its expanded authority to cover its costs through fees by phasing in fee increases for permits. In prior years, the district's direct costs were apportioned among the permit holders based on a formula derived from labor costs incurred in the permit programs. After a public hearing and a workshop for permit holders, the district's fee system was changed to a two-tiered system commencing in

---

[1] The Industrial Environmental Association (IEA) of San Diego County participated in the action as an intervener. SDG&E and intervener IEA are referred to collectively in this opinion as SDG&E unless specific reference is made to intervener IEA.

[2] All subsequent statutory references are to the Health and Safety Code unless otherwise specified.

[3] The local air pollution control districts are responsible for controlling air pollution from all sources other than vehicular sources, whereas the State Air Resources Board is responsible for controlling vehicular sources. (§ 39002.) Section 42300 authorizes every district board to establish a permit system requiring permits for the operation of equipment which causes air pollution.

fiscal year 1986-1987—still apportioning direct costs based on the labor standard, but adding indirect costs to the fees and apportioning them by a formula derived from the amount of emissions discharged by a stationary pollution source. (APCD Rule 40.) The district considered a variety of factors before adopting the new formula. The various types of stationary sources of pollution are divided into separate fee schedules (i.e., abrasive blasting equipment, asphalt roofing kettles, rock drills, brick manufacturing plants, fish canneries, etc.). The permitted sources are charged (1) a fee for a permit to construct and operate, based on time and material charges, and (2) an annual permit renewal fee, to pay for ongoing implementation, enforcement and related activities.

APCD costs related to the permitted sources of pollution are separated into three groups: (1) direct (identified with a specific fee schedule); (2) direct add-on (directly related to the permit system but not attributable to a specific fee schedule—i.e., labor tracking, permit coding, permit system related training, etc.); and, (3) indirect (related to the overall program but not directly related to permit activity—i.e., personnel matters, rule development, correspondence, complaint investigations, hearing board participation, consultation with other agencies, etc.).

The fee schedules for the direct costs and direct add-on costs are based on data obtained from a labor-tracking system. Actual labor expended (direct costs) on activities related to a specific fee schedule are charged against that fee schedule. The total labor cost tracked for each fee schedule is then divided by the number of fee units within that schedule to obtain the average labor cost per fee unit. Direct add-on costs, which are directly attributable to the permit system but not to a specific fee schedule, are added to the permit renewal fees based on the ratio of total labor expended within a specific permit renewal fee schedule to the total labor expended within all permit fee schedules. Thus, the higher direct cost permit renewal fee schedules receive a larger share of the direct add-on costs.

Amended Rule 40 permits recouping indirect costs through additional renewal permit fees based on the average pollution generated by a facility within a specific industry, rather than based on the labor-tracking system described above for direct costs. The San Diego County APCD argues an emissions-based fee schedule for indirect costs more equitably distributes permit program costs among large and small polluters. In contrast, if the indirect costs were recovered through the same labor-tracking formula used for direct costs, small polluters would pay more than their proportionate contribution to pollution.

## An Emissions-based Fee Schedule Is Within Statutory Guidelines

*Original enactments*

Sections 42311 and 40510 were enacted in 1975 and 1976.

Section 40510, pertaining to the south coast district board,[4] contains specific language authorizing fees to be based on emissions. That section states: "The south coast district board may adopt a fee schedule for the issuance of variances and permits to cover the cost of planning, inspection, and monitoring related thereto. . . .

*"The fees may be varied according to the quantity of emissions and the effect of such emissions on the ambient air quality within the south coast district."* (§ 40510, italics added.)

In contrast, section 42311, pertaining to local district boards, including San Diego's APCD, does not mention emissions as a basis for charging fees. At the time of its 1975 enactment, the section stated: " '(a) A district board may adopt, by regulation, a schedule of fees not exceeding the estimated cost of issuing permits and inspection pertaining to such issuance to be paid for the issuance of permits. Every person applying for a permit shall pay the fee required by the schedule.' " (41B West's Ann. Health & Saf. Code (1986 ed.) (hereinafter West's) § 42311, p. 320.)

Section 42311 has been amended several times, but still does not specify emissions as a basis for apportioning fees. Thus, SDG&E contends since section 40510 expressly authorizes the south coast district board to base fees on emissions, whereas section 42311 makes no such specification for local districts, the Legislature has shown an intent not to allow local districts to base fees on emissions. An extensive legislative history convinces us the district's emission fee policy is within its statutory powers.

Section 42311 (Assem. Bill No. 1758) and section 40510 (Assem. Bill No. 250) were introduced as bills by Assemblyman Lewis during the 1975-1976 legislative session. Section 42311 was derived from former section 24267, enacted in 1947, utilizing essentially the same language.[5] Section 40510 was

---

[4] The south coast district board was created to control air pollution in the Counties of Los Angeles, Orange, Riverside, and San Bernardino, in recognition of the critical air pollution problems existing in the South Coast Air Basin. (§§ 40402, 40410, 40412.)

[5] Former section 24267 stated: "The air pollution control board may provide by regulation a schedule of fees not exceeding the estimated cost of issuing such permits and inspection per-

a new statute. Assembly Bill No. 250 was introduced on December 13, 1974, amended to add the emissions language on April 3, 1975, and enacted on July 3, 1976. Assembly Bill No. 1758 was introduced April 14, 1975, and enacted on September 22, 1975.

After its 1975 enactment, section 42311's fee language was amended several times. In 1979, the section was rewritten to state: " 'A district board may adopt, by regulation, a schedule of fees for each fiscal year, commencing with the 1979-80 fiscal year, to be paid for the issuance and renewal of permits. *Such schedule of fees shall not exceed the estimated cost for such fiscal year of (1) evaluation and issuance of permits, (2) inspection,* including source testing and surveillance, of sources for which a permit or permits have been issued, to the extent such inspection is for the purpose of determining whether such sources are in compliance with all applicable permit conditions and all applicable orders, rules, or regulations . . . , *and (3) implementation and enforcement of permit terms* and conditions.' "[6] (West's, *supra,* § 42311, p. 321, italics added.)

The 1979 amendment also added subdivision (c) (current subdivision (e)) which states that section 42311 does not apply to the south coast district board, which is governed by section 40510. (West's, *supra,* § 42311, p. 321.)

*Interpretation of section 42311 before 1982 amendment*

The Governor's proposed budget for fiscal year July 1982-June 1983 sought to decrease subvention funding of local districts by 80 percent. Faced with local districts' claims they would not be able to support themselves with such a drastic cut in state funds, the legislative analysis of the budget bill for the fiscal year 1982-1983 deferred recommending what the level of state funding to the local districts should be pending evaluation of how support of the districts could be accomplished. This report stated that to offset the proposed reduction in state support, the administration intended to seek legislation authorizing local districts to charge emission fees to cover operating costs noting that under current law only the south coast district had such authority.[7] The emissions fees concept had been recom-

---

taining to such issuance to be paid for the issuance of such permits. Every person applying for a permit shall pay the fee required by such schedule." (Stats. 1947, ch. 632, p. 1647.)

[6] The 1979 statute (and the current statute) also stated that the estimated costs were not to exceed the estimated costs for the immediately preceding fiscal year, with an adjustment no greater than the change in the California Consumer Price Index, and that any revenues from the fees which exceed the cost of the activities should be carried over in the subsequent fiscal year and the schedule of fees changed to reflect the carryover.

[7] In contrast, in an August 1982 letter, the Counsel for the State Air Resources Board responded to a local district's inquiry, referring to the language of section 42311 as of 1979, and

mended in a December 1980 study prepared for the legislative analyst's office which noted emissions fees were advantageous because they imposed a portion of the cost to control pollution on its sources and provided an incentive for emissions reduction. Although observing collection of emissions fees would make most districts self-supporting, the legislative analyst deferred its recommendation on the level of state support until legislation permitting the fees to be levied could be enacted and fee schedules put in place in each district.

*1982 amendment of section 42311*

Effective October 1, 1982, section 42311 was amended to state: "'A district board may adopt, by regulation, a schedule of annual fees to be paid for the evaluation, issuance, and renewal of permits *to cover the cost of district programs* related to permitted stationary sources authorized or required under the provisions of Division 26 (commencing with Section 39000) that are not otherwise funded. . . .'" (West's, *supra,* § 42311, p. 321, italics added.)

The 1982 bills to amend section 42311 (Sen. Bill No. 1326 and Sen. Bill No. 1477) originally included emissions fees language as contained in section 40510—i.e., a sentence would have been added stating the fees may vary according to the quantity of emissions and according to the effect of the emissions on air quality. In a May 1982 letter from the chairman of the Senate Committee on Local Government (Senator Marks), reference was made to that committee's reasons for recommending deletion of the emissions language. Marks's letter, addressed to the Chairman of the Senate Committee on Finance (Senator Alquist), stated: "When I wrote to you on April 1, regarding the Local Government Committee's recommendations on SB 1326 and SB 1477, I attached a background report comparing the two bills. An ambiguity in that report has caused some local officials and industry representatives to ask for clarification.

"The first sentence of the second paragraph on page six ought to read: 'The Committee agreed to require APCDs to levy fees by ordinance to pay for programs that are not otherwise funded, but deleted language which appeared to limit these fees to emissions fees.'[8] The committee's action

opining a fee schedule which was based on emissions was a permissible method of allocating the district's costs.

[8] The first sentence of the second paragraph on page 6 of the Local Government Committee's background report, dated April 1, 1982, had stated: "The Committee agreed to require APCDs to levy fees by ordinance to pay for programs that are not otherwise funded, but declined to allow emissions fees." Earlier staff analysis reports of the committee, dated March

neither decreased nor increased APCDs' current ability to use emissions fees.

"Thank you for your consideration of this clarification." (Fn. added.)

The 1982 amendment also added subdivision (g) (deleted in 1985) requiring the legislative analyst to review the fee systems' capability to finance the activities of local districts, evaluate the overall equity and reasonableness of the fees as they affect segments of industry and agriculture which pay the fees, and report the findings and recommendations to the Legislature by October 1, 1983. (West's, *supra,* § 42311, p. 321.) In the 1982 statute, the Legislature stated its intent was to investigate new opportunities for reducing the costs of administering programs in which the state and counties share responsibility, and the legislative analyst was requested to work with county officials and estimate the savings to the state and counties if certain proposals were implemented, along with the probable effects on program beneficiaries, and to submit progress reports to the Legislature by January 1, 1983, and July 1, 1983, and a final report by January 1, 1984. (Stats. 1982, ch. 1638, § 11, p. 6665.)[9]

*1983 legislative analyst report*

The legislative analyst report on "Financing Air Pollution Control" dated October 1983 summarizes past developments, including the proposed (but essentially not enacted) cuts in state funding of local districts for the 1982-1983 fiscal year. The report described the 1982 amendments to section 42311 (ch. 1638), noting that chapter 1638 expanded the purposes for which permit fee revenue may be used. Further, the report observed: "The general understanding of the Legislature and the districts during consider-

---

17 and 31, 1982, respectively, had stated: "Others are also concerned that the ability to vary fees based on quantity and air pollution effects may allow APCDs to require expensive in-stack monitoring devices. The Committee may wish . . . to specifically declare that the bill does not require the installation of measuring units"; and "Some are concerned that the language in both bills that permits APCDs to vary fees based on quantity and air pollution effects may allow districts to require emissions fees. The Committee may wish to delete this language."

[9] The 1982 amendment also added subdivision (b) (current subd. (c)) providing that the district board could adopt a fee schedule for fiscal years ending before July 1, 1984 (extended to 1986 in a 1984 amendment) to offset loss of state and federal subvention funds (which the legislature found was necessary to provide a transition period to develop an equitable funding mechanism for local districts). The 1982 amendment added subdivision (e) (current subd. (f)) providing that the district board should hold a public meeting before adopting a regulation establishing fees and make information available indicating the amount of cost required to provide the service for which the fee is charged and the revenue sources anticipated to provide the service.

ation of Chapter 1638 appears to have been that the districts would adopt 'emission' fees. Because the Legislature continued funding for subventions last year, however, only two districts exercised their authority to establish fees. . . .

"The type of fees authorized in chapter 1638 is not defined. Moreover, our preliminary work on this report indicated that the nature of emission fees and the role of these fees in financing air pollution activities is not clear from a conceptual standpoint.

"In recognition of this, we have attempted in this report to refine the concept of emission fees and incorporate it in a system for financing state and local air quality activities."[10]

The executive summary of the 1983 legislative analyst's report notes that in submitting the 1982-1983 budget, the governor proposed "legislation be enacted authorizing the districts to charge fees for stationary source emissions in order to replace the revenues lost" as a result of the proposed 80 percent reduction in state subventions to local districts. The report characterized the 1982 amendments as "authorizing districts to impose emission fees."[11]

*1985 amendments*

In 1985, the Legislature added the last sentence to subdivision (a) of section 42311, stating, "Nothing in this subdivision precludes the district from recovering, through its schedule of annual fees, the estimated reasonable costs of district programs related to permitted stationary sources."[12] The 1985 amendments also added two new subdivisions, (b) and (h). Subdivision (b) allows the district board to charge a deposit prior to evaluating a

---

[10] This information is obtained from the introduction to the 1983 legislative analyst's report. The report itself was not included in the record.

[11] Since the report had already observed that the type of fees authorized in the 1982 amendments were not defined, the legislative analyst was apparently interpreting the 1982 amendments as impliedly authorizing emissions fees.

[12] Letters, dated March and June 1985, from Santa Barbara's county counsel to legislators urged support of the 1985 amendments for the following reasons. The amendments were necessary to clarify that a local district is entitled to fully recover its actual costs for the evaluation, issuance and renewal of permits, which was the Legislature's original intention. This intent was not clearly reflected in the existing language of the statute, since it could be interpreted as limiting a local district from recovering its actual costs for permit processing during any year where those costs exceed the prior year's costs plus an increase in the Consumer Price Index. Such an interpretation would cause extreme hardship in Santa Barbara County where the extraordinary rate of growth in the oil and gas industry has caused a corresponding expansion in the effort to evaluate and issue permits.

permit application, and requires that the district refund any significant portion of the deposit which exceeds the actual reasonable cost of evaluating the application. Subdivision (h) allows the district to charge fees for permit holders emitting toxic air contaminants based on the direct and indirect costs of district activities relating to each toxic air contaminant.[13]

Our statutory analysis involves two concepts: (1) the extent to which a local district may recoup costs by collecting fees from permit holders (rather than relying on government funds); and, (2) the methods by which a district may allocate program costs between permit holders. As we discuss below, section 42311 has expanded the authority of the district so that it may now recover all costs related to permitted stationary sources through fees. Further, section 42311 now partially addresses the methods by which the district may allocate certain costs among permit holders. That is, subdivision (b) allows a local district to charge a deposit for evaluating a permit application based only on the actual cost of the evaluation. Subdivision (h) allows a district to assess fees against those emitting toxic air contaminants based on the actual costs of programs related to those toxins. Other than these two specific cost items, however, the statute does not address how the remaining costs involved in issuing and renewing permits may be allocated. Moreover, the statute from its inception has been silent as to how the district may allocate among permit holders the indirect costs pertaining to the overall permit program but not attributable to any specific permit activity or permit holder.

As amended in 1979, section 42311 specified the activities for which fees could be charged (i.e., costs of evaluating and issuing permits, of inspecting for compliance with permit conditions and regulations, and of implementing and enforcing permit terms and conditions). The 1982 amendment expanded the language of section 42311, broadly stating fees could be charged for evaluating, issuing and renewing permits to "cover the cost" of the district's programs.

SDG&E and the district do not dispute that under the 1979 statute the district could only charge fees to cover the costs directly pertaining to the permits, whereas under the 1982 statute, the district can now charge fees to cover all costs of its program, including indirect costs not related to a specific permit activity.[14] The Legislature indicated its intent in the 1982

---

[13] A copy of the current language of section 42311 is attached at the end of this opinion, as an appendix.

[14] Focusing in on subdivision (b) of section 42311, IEA meritlessly argues that the district is only entitled to charge fees to cover the costs of evaluating permit applications. The 1985

statute that the government's cost of administering the program be decreased and that systems be studied to determine whether fees could finance the districts. The 1985 amendment, by adding the last sentence to subdivision (a), clarified that all reasonable costs could be recovered through fees.

The legislative history of section 42311 suggests the Legislature, at least by 1982, contemplated the districts should use an emissions-based fee schedule to support their operations. The 1982-1983 legislative analyst's budget report referred to the desirability of emissions fees. The 1983 legislative analyst's report on air pollution control financing explicitly stated the general understanding of the Legislature and the districts during consideration of Chapter 1638 was the districts would adopt emissions fees, and the report characterized the 1982 amendments as authorizing emissions fees.

SDG&E notes the legislative analyst in the 1982-1983 budget report expressed an opinion that under current legislation, only the south coast district, not the local districts, had the authority to base fees on emissions,[15] and the 1982 and subsequent amendments did not include a reference to the use of emissions fees. At the time of the 1982-1983 budget report, the 1979 statute was in effect, which statute was interpreted as not authorizing the recoupment through fees of indirect costs of the permit program. It is these indirect costs, recoverable under the 1982 amendments, which San Diego's APCD has apportioned based on emissions. Thus, even if arguendo the 1979 statute were interpreted as not allowing direct costs to be apportioned based on emissions,[16] it does not necessarily follow the 1982 statute does not allow indirect costs to be apportioned based on emissions.

Moreover, the budget report suggests the desirability of a district-implemented fee system based on emissions, and this legislative understanding was again acknowledged in the 1983 legislative analyst's report. Thus, regardless of whether under the 1979 statute the district had authority to base fees on emissions, the 1982 amendment clearly contemplated such authority. Although the 1982 amendment did not expressly authorize the use of

amendment to subdivision (a) clarified that the district may charge fees to recover the estimated reasonable costs of its programs.

[15] SDG&E also points to a staff report of the Assembly Subcommittee on Air Quality, dated April 22, 1975, which could arguably (but need not necessarily) be viewed as suggesting the same interpretation. The report states the bill creating the south coast district board gives it all the powers and duties of the county and regional districts, with specified exceptions, and in addition grants it "the following additional powers and duties." The report then proceeds to list 14 features of the bill, one of which is the provision that the south coast district could vary its fees according to emissions.

[16] Since the 1979 statute was silent as to how the costs should be allocated among the permit holders, the legislative analyst's interpretation was not compelled.

emissions fees, there is no indication in the legislative history suggesting the Legislature determined, contrary to the legislative analyst's recommendations, that costs-apportionment should *not* be based on emissions.

Given the strong recommendation by the legislative analyst that emissions fees were an appropriate method of paying for the costs of the districts' programs and the lack of a contrary recommendation, the implication urged by SDG&E arising from the failure to include the proposed emissions fees language in the 1982 amendment is not convincing. As suggested in the May 1982 letter from Senator Marks clarifying an ambiguity on the emissions issue, the language appears to have been deleted to ensure the statute was not construed as *requiring* the fees be based on emissions. (*Ravettino* v. *City of San Diego* (1945) 70 Cal.App.2d 37, 47 [160 P.2d 52] [delegation of power to local government, without providing mode for carrying power into effect, impliedly gives right to select lawful and reasonable means].)

The express reference to the possibility of using emissions as a basis for the south coast district board's fees in section 40510 is not sufficient to overcome the strong indications of legislative intent in the legislative analysts' reports pertaining to section 42311. The general rule that where a statute contains a critical phrase, omission of that phrase from a similar statute on the same subject shows a different legislative intent (see *Craven* v. *Crout* (1985) 163 Cal.App.3d 779, 783 [209 Cal.Rptr. 649]), cannot be reasonably applied to this statutory scheme. Construing the Legislature's decision not to include the reference to emissions in section 42311 as precluding the use of fees based on emissions, gives undue weight to a rule of legislation by implication and ignores the concrete evidence of intent favoring an emissions-based system in the legislative analyst reports.

Analyzing the various subdivisions of section 42311, intervener IEA argues the Legislature has evinced a general intent that the districts only charge fees to a permit holder for the work related to that permit holder's permit, and not for work done on another's permit. This argument ignores the fact the San Diego district's fee schedule uses an emissions-based, rather than labor-based, apportionment method only for those indirect costs which are related to the overall permit program but which cannot be directly attributed to any specific permit activity or fee schedule. Thus, the emissions-based schedule does not charge a permit holder for work on another's permit, since these indirect costs by definition do not involve a specific permit holder.

THIS EMISSIONS-BASED FEE SCHEDULE IS NOT A SPECIAL TAX
UNDER PROPOSITION 13

California Constitution, article XIII A, section 4 (§ 4), enacted in June 1978 as part of Proposition 13, provides: "Cities, counties and special districts, by a two-thirds vote of the qualified electors of such district, may impose special taxes on such district, except ad valorem taxes on real property or a transaction tax or sales tax on the sale of real property within such City, County, or special district."

The parties dispute whether this district is a "special district" within the meaning of Proposition 13 (see *Los Angeles County Transportation Com.* v. *Richmond* (1982) 31 Cal.3d 197, 206-208 [182 Cal.Rptr. 324, 643 P.2d 941]; *Huntington Park Redevelopment Agency* v. *Martin* (1985) 38 Cal.3d 100, 106-107 [211 Cal.Rptr. 133, 695 P.2d 220]).[17] ▮ We need not resolve this issue, because the record readily shows these emissions-based fees are a regulatory fee, not a "special tax," and outside the purview of section 4.

▮ Proposition 13 was enacted to give effective property tax relief. *(Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization* (1978) 22 Cal.3d 208, 231 [149 Cal.Rptr. 239, 583 P.2d 1281].) Article XIII A of the Constitution consists of four major elements: a real property tax limitation (§ 1), a real property assessment limitation (§ 2), a restriction on state taxes (§ 3), and a restriction on local taxes (§ 4). *(Id.* at pp. 220, 231.) Section 4 is a limitation on the imposition of "special taxes" by local entities because it requires a two-thirds vote of the local electorate. *(Id.* at pp. 220, 231, 242; *Los Angeles County Transportation Com.* v. *Richmond, supra,* 31 Cal.3d at p. 201.) Sections 3 and 4 were included to restrict imposition of additional or increased state or local taxes other than property taxes which would effectively withdraw or deplete the property tax savings in sections 1 and 2. *(Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization, supra,* 22 Cal.3d at p. 231; *Huntington Park Redevelopment Agency* v. *Martin, supra,* 38 Cal.3d at p. 105.)

▮ A "special tax" under section 4 does not embrace fees charged in connection with regulatory activities which do not exceed the reasonable

---

[17] In *Los Angeles County Transportation Com.* v. *Richmond, supra,* 31 Cal.3d at pages 207-208, our Supreme Court narrowly defined a "special district" as a local entity empowered to levy *property* taxes. The court held since the Los Angeles County Transportation Commission—which was authorized to adopt a retail transaction and use tax if approved by a majority of the voters—was not authorized to levy property taxes, it was not a special district, and thus a majority, not a two-thirds, vote of the electorate was sufficient to adopt the tax. SDG&E argues, inter alia, that although the district does not have the power to levy property taxes, the emissions-based fee schedule was levied by the board of supervisors (sitting as the district's governing body, the Air Pollution Control Board), and the board of supervisors does have the power to levy property taxes.

cost of providing services necessary to the activity for which the fee is charged and are not levied for unrelated revenue purposes. (*Pennell* v. *City of San Jose* (1986) 42 Cal.3d 365, 375 [228 Cal.Rptr. 726, 721 P.2d 1111]; Gov. Code, § 50076; *Mills* v. *County of Trinity* (1980) 108 Cal.App.3d 656, 661 [166 Cal.Rptr. 674]; see generally, *United Business Com.* v. *City of San Diego* (1979) 91 Cal.App.3d 156, 165-167 [154 Cal.Rptr. 263], describing distinctions between regulatory fee and revenue-raising tax.)

As stated in *Beaumont Investors* v. *Beaumont-Cherry Valley Water Dist.* (1985) 165 Cal.App.3d 227, 235 [211 Cal.Rptr. 567], to show a fee is a regulatory fee and not a special tax, the government should prove (1) the estimated costs of the service or regulatory activity, and (2) the basis for determining the manner in which the costs are apportioned, so that charges allocated to a payor bear a fair or reasonable relationship to the payor's burdens on or benefits from the regulatory activity.[18]

■ Here, the terms of section 42311 limit the amount of fees which may be charged to the reasonable costs of the district's programs. The mandate action did not challenge the reasonableness of the district's costs, but only the method of apportioning those costs based on emissions.[19] The record shows the allocation of costs based on emissions fairly relates to the permit holder's burden on the district's programs.

The district's report explains in detail the rationale and method used for apportioning the costs on an emissions-based, rather than labor-based, standard for apportioning indirect costs. If the labor-based standard, already used to apportion direct costs, were also used for indirect costs small polluters would pay fees greater than their proportionate contribution to pollution, whereas large polluters would pay proportionately less. For example, under the labor-based system for direct costs, service stations pay about 34 percent of the total annual permit renewal fees, and emit cumulatively only 1 percent of the industrial pollution. In contrast, the 31 major polluters pay about 13 percent of the fees, but emit 38 percent of the industrial pollution

---

[18] To show a regulatory fee is not a special tax, it is not necessary for the payor to perceive the regulation as a "benefit." A regulatory fee may be imposed under the police power when the fee constitutes an amount necessary to carry out the purposes and provisions of the regulation. (See *Pennell* v. *City of San Jose, supra,* 42 Cal.3d at p. 375; see also *Mills* v. *County of Trinity, supra,* 108 Cal.App.3d at p. 661.)

[19] Intervener IEA's brief at one point vaguely asserts the district took no steps to "determine the precise costs of regulation and the appropriate formula for apportioning those costs." It is clear a challenge to the district's method of estimating its costs was not raised below, and it may not be raised for the first time on appeal. (*San Marcos Water Dist.* v. *San Marcos Unified School Dist.* (1986) 42 Cal.3d 154, 168 [228 Cal.Rptr. 47, 720 P.2d 935].) In any event, the record indicates indirect costs are estimated based on labor activity reports for the previous fiscal year and adjusted for changes in the Consumer Price Index.

and 51 percent of the pollution from permitted facilities. Moreover, using an emissions-based standard for indirect costs would provide an incentive to large polluters to reduce existing emissions to reduce fees.[20]

Although recommending the use of an emissions-based standard for indirect costs, the report also presents alternative methods of allocating the costs. That is, all permit fees (direct and indirect) could be based on the amount of emissions on the premise fees should be based on a facility's share of pollution. The disadvantage to such a system is that small polluters would experience a windfall; for example, the average service station would pay $25 rather than the current $375 annual fee; thereby taking away the incentive for small operators to maintain their equipment. Alternatively, all fees, including indirect costs, could be allocated based on the labor standard used for direct costs. As stated above, the disadvantage would be the inequity of having small polluters paying much more than their proportionate share; for example, service stations would pay about 30 percent of the additional fees while emitting only about 1 percent of the industrial pollution.

The district's determination that a purely labor-based standard results in small polluters paying fees greater than their proportionate share of pollution reasonably justifies using an emissions-based standard to more equitably divide the costs based on the amount of pollution caused.

SDG&E argues the district has not specifically shown how the amount of emissions generated by a pollution source increase the district's indirect costs, citing the *Beaumont* case in support of its argument. In *Beaumont Investors* v. *Beaumont-Cherry Valley Water Dist., supra,* 165 Cal.App.3d at pages 236-238, the court found no evidence in the record showing how the estimated costs of the anticipated government activity were ascertained or apportioned. In contrast here, the district's method of estimating its costs was not challenged, and the district's report details the apportionment method and its rationale. There is no reason to require the district to show precisely how more emissions generate more costs to justify the emissions-based apportionment formula. The purpose for the district's existence is to achieve and maintain air quality standards (§ 40001), thus from an overall perspective it is reasonable to allocate costs based on a premise that the

---

[20] As explained more specifically, the labor-based standard provides an incentive to maintain ongoing *compliance* with pollution control requirements to keep district enforcement costs, and thereby fees, down. However, it provides no incentive to *lower emissions*. For example, SDG&E can burn oil as well as natural gas in its power plants, both in compliance with requirements, but more pollution is generated when oil is burning. The emissions-based fees would provide an incentive to use natural gas instead of oil.

more emissions generated by a pollution source, the greater the regulatory job of the district.[21]

Moreover, the district diligently evaluated the various methods of apportioning costs, and recommended a two-tiered system, utilizing both a labor and emissions apportionment standard, seeking to distribute the financial burden of controlling pollution in proportion to a stationary source's contribution to pollution, and to provide incentives for sources to control their pollution. No further showing is necessary to establish the emissions-based fees are reasonably related to the district's costs of regulating a permit holder's air pollution, and thus are not a special tax. (Cf. *White* v. *County of San Diego* (1980) 26 Cal.3d 897, 905 [163 Cal.Rptr. 640, 608 P.2d 728]; *J. W. Jones Companies* v. *City of San Diego* (1984) 157 Cal.App.3d 745, 755, 756, 758 [203 Cal.Rptr. 580].)

SDG&E also argues the emissions-based fees thwart the purpose of Proposition 13 since they are designed to replace lost revenues from Proposition 13 without subjecting them to a two-thirds vote of the electorate.[22] The argument is misplaced in the context of this action since it is not the emissions-based formula itself, but rather the 1982 amendment to section 42311 (allowing full cost recovery through fees) which serves to replace lost government funding. The emissions formula is merely a method of allocating the increased fees among the permit holders, and even if only the labor-based formula urged by SDG&E was used, the fees would still be increased to replace public funds. Proposition 13's goal of providing effective property tax relief is not subverted by the increase in fees or the emissions-based apportionment formula. A reasonable way to achieve Proposition 13's goal of tax relief is to shift the costs of controlling stationary sources of pollution from the tax-paying public to the pollution-causing industries themselves, an accomplishment of the 1982 amendments to section 42311 and the emis-

---

[21] The district argues major polluters cost the district more because if not for their existence, it would have a reduced need to extensively regulate smaller sources of pollution. SDG&E responds the major source of pollution is from transportation sources, and contrary to the district's assertion, the district would have to regulate small stationary polluters even if the big stationary polluters did not operate. We are not presented here with issues pertaining to the division of responsibility for pollution between transportation and stationary sources of pollution, nor need we rely on the district's analysis of how big polluters require regulation of small polluters. Section 42311 allows the district to impose fees to cover the costs of its programs pertaining to stationary sources of pollution, and for the reasons we state above, the emissions-based formula is a reasonable method of apportionment among the stationary permit holders.

[22] This assertion is made in connection with the argument that the APCD is a "special district." Although we need not address the special district issue, we respond to the argument pertaining to the circumvention of Proposition 13 since it is an underlying theme used to challenge the validity of the emissions-based fees.

sions-based fee schedule. (See *Mills* v. *County of Trinity, supra,* 108 Cal.App.3d at p. 663.)

Judgment affirmed.

Wiener, Acting P. J., and Woodworth, J.,* concurred.

The petition of intervenors & appellants for review by the Supreme Court was denied November 10, 1988.

APPENDIX

## § 42311. Fee schedule

(a) A district board may adopt, by regulation, a schedule of annual fees for the evaluation, issuance, and renewal of permits to cover the cost of district programs related to permitted stationary sources authorized or required under this division that are not otherwise funded. The fees assessed under this section shall not exceed, for any fiscal year, the actual cost of district programs for the immediately preceding fiscal year with an adjustment not greater than the change in the annual California Consumer Price Index as determined pursuant to Section 2212 of the Revenue and Taxation Code for the preceding year. Any revenues received by the district pursuant to the fees, which exceed the cost of the programs, shall be carried over for expenditure in the subsequent fiscal year, and the schedule of fees shall be changed to reflect that carryover. Every person applying for a permit, notwithstanding Section 6103 of the Government Code, shall pay the fees required by the schedule. Nothing in this subdivision precludes the district from recovering, through its schedule of annual fees, the estimated reasonable costs of district programs related to permitted stationary sources.

(b) The district board may require an applicant to deposit a fee in accord with the schedule adopted pursuant to subdivision (a) prior to evaluating a permit application, if the district accounts for the costs of its services and refunds to the applicant any significant portion of the deposit which exceeds the actual, reasonable cost of evaluating the application.

---

*Assigned by the Chairperson of the Judicial Council.

(c) In addition to the fees authorized by subdivisions (a) and (b), the district board may adopt, by regulation, a fee schedule for district programs related to permitted stationary sources for fiscal years ending before July 1, 1986, which allows the district to offset the loss of any state and federal subvention funds. The total amount raised by this fee schedule shall not exceed the amount of funds lost from state and federal subventions.

(d) Except as provided in Section 42313, all the fees shall be paid to the district treasurer to the credit of the district.

(e) This section does not apply to the south coast district board which is governed by Section 40510.

(f) In addition to providing notice as otherwise required, before adopting a regulation establishing fees pursuant to this section, the district board shall hold at least one public meeting, at which oral or written presentations can be made, as part of a regularly scheduled meeting. Notice of the time and place of the meeting, including a general explanation of the matter to be considered, and a statement that the information required by this section is available, shall be mailed at least 14 days prior to the meeting to any interested party who files a written request with the district board. Any written request for the mailed notices shall be valid for one year from the date on which it is filed unless a renewal request is filed. Renewal requests for the mailed notices shall be filed on or before April 1 of each year. The district board may establish a reasonable annual charge for sending the notices based on the estimated cost of providing that service. At least 10 days prior to the meeting, the district board shall make available to the public information indicating the amount of cost, or estimated cost, required to provide the service for which the fee is charged and the revenue sources anticipated to provide the service. Any costs incurred by the district board in conducting the required meeting may be recovered from fees charged for the programs which were the subject of the meeting.

(g) The Legislature finds and declares that because districts vary greatly in their dependence on state and federal subvention programs, county and district property tax support, and permit fees, it is necessary to provide a transition period to develop an equitable funding mechanism for local districts. Subdivision (c) accordingly authorizes districts to adopt certain fee schedules only for fiscal years ending before July 1, 1986, unless a later enacted statute deletes or extends this date.

(h) In addition to any other fees authorized by this section, a district board may adopt, by regulation, a schedule of annual fees to be assessed against permitted nonvehicular sources emitting toxic air contaminants identified pursuant to the procedure set forth in Sections 39660, 39661, and 39662. A district board shall demonstrate that the fees assessed under this subdivision do not exceed the reasonable, anticipated costs of funding district activities mandated by Section 39666 related to nonvehicular source emissions. In making the demonstration, the district shall account for all direct and indirect costs of district activities related to each toxic air contaminant. If the district does not make this demonstration, it shall make reimbursement for that portion of the fee not determined to be reasonable.