TO BE PUBLISHED IN THE OFFICIALS REPORTS

OFFICE OF THE ATTORNEY GENERAL
State of California

DANIEL E. LUNGREN
Attorney General

| | | |
|---|---|---|
| OPINION | : | No. 92-519 |
| of | : | |
| | : | |
| DANIEL E. LUNGREN | : | MARCH 11, 1993 |
| Attorney General | : | |
| | : | |
| GREGORY L. GONOT | : | |
| Deputy Attorney General | : | |
| | : | |

THE HONORABLE CHARLES W. QUACKENBUSH, MEMBER OF THE CALIFORNIA ASSEMBLY, has requested an opinion on the following question:

May air quality management districts and air pollution control districts impose a permit system upon indirect sources of air pollution?

CONCLUSION

Air quality management districts and air pollution control districts may not impose a permit system upon indirect sources of air pollution.

ANALYSIS

Air quality management districts and air pollution control districts (hereinafter "districts") have been established in California pursuant to Health and Safety Code sections 40000-41133.[1] Their principal function is to "adopt and enforce rules and regulations to achieve the state and federal ambient air quality standards in all areas affected by emission sources under their jurisdiction. . . ." (§ 400001.) District plans for achieving ambient air quality standards are subject to approval by the California Air Resources Board (hereinafter "Board"). While the Board has primary responsibility for the control of emissions from motor vehicles, the districts have primary responsibility for the control of air pollution for non-vehicular sources. (§ 40000.)

The California Clean Air Act of 1988 (Stats. 1988, ch. 1568; hereinafter "Act") added a number of statutes to the Health and Safety Code relating to the attainment of state ambient air quality standards. Among them was section 40716, which provides as follows:

---

1. All section references are to the Health and Safety Code unless otherwise indicated.

"(a) In carrying out its responsibilities pursuant to this division with respect to the attainment of state ambient air quality standards, a district may adopt and implement regulations to accomplish both of the following:

"(1) Reduce or mitigate emissions from indirect and areawide sources of air pollution.

"(2) Encourage or require the use of ridesharing, vanpooling, flexible work hours, or other measures which reduce the number or length of vehicle trips.

"(b) Nothing in this section constitutes an infringement on the existing authority of counties and cities to plan or control land use, and nothing in this section provides or transfers new authority over such land use to a district."[2]

The question presented for analysis is whether districts have the authority under section 40716, or any other statute, to impose a permit system upon indirect sources of air pollution. We conclude that districts do not have statutory authority to require a permit either to construct an indirect source of air pollution or to operate one.

The term "indirect source" is not defined in the relevant state statutes. However, the federal Clean Air Act (42 U.S.C. § 7401, et seq.) defines the term in the context of the air pollution control plans which the states are required to implement:

"For purposes of this paragraph, the term `indirect source' means a facility, building, structure, installation, real property, road, or highway which attracts, or may attract, mobile sources of pollution. Such term includes parking lots, parking garages, and other facilities subject to any measure for management of parking supply (within the meaning of subsection (c)(2)(D)(ii) of this section), including regulation of existing off-street parking but such term does not include new or existing on-street parking. Direct emissions sources or facilities at, within, or associated with, any indirect source shall not be deemed indirect sources for the purpose of this paragraph." (42 U.S.C. § 7410(a)(5)(C).)

"Indirect source" has also been defined by the Board as "any facility, building, structure or installation, or combination thereof which generates or attracts mobile source activity that results in the emissions of any pollutant for which there is a state ambient air quality standard." (California Clean Air Act Guidance for the Development of Indirect Source Control Programs (Cal. Air Resources Board, 1990) Appendix A, p. 2.) Thus, an indirect source may be considered to be any development which attracts direct vehicular sources of air pollution. Sports complexes and major shopping centers are prime examples of such developments.

While section 40716 does not expressly authorize the imposition of a permit system, section 42300 allows districts to require permits for potential sources of air pollution as specified therein:

---

2.    "Although not statutorily defined, areawide sources are understood to mean small, nonvehicular sources such as residential heaters and wood stoves." (2 Cal. Environmental Law and Land Use Practice (1992) § 44.06[4], fn. 17.)

"Every district board may establish, by regulation, a permit system that requires, except as otherwise provided in Section 42310, that before any person builds, erects, alters, replaces, operates, or uses any article, machine, equipment, or other contrivance which may cause the issuance of air contaminants, such person obtain a permit to do so from the air pollution control officer of the district."

The list of exceptions contained in section 42310 includes, *inter alia*, vehicles, agricultural equipment, barbecue equipment that is not used for commercial purposes, dwellings used by not more than four families, and incinerators used in connection with such dwellings. Indirect sources are not specifically mentioned in either the general authorization for permitting (§ 42300) or in the exceptions thereto (§ 42310).

Although indirect sources may be viewed in a certain sense as "caus[ing] the issuance of air contaminants," they cannot be properly classified as "any article, machine, equipment, or other contrivance. . . ." (§ 42300.) "Article" implies a component of a larger item, and "contrivance," in the sense used here, is generally thought of as a mechanical device. (Webster's New Internat. Dict. (3d ed. 1966) pp. 123, 496.) In *San Diego Gas & Electric Co.* v. *San Diego County Air Pollution Control District* (1988) 203 Cal.App.3d 1132, the Court of Appeal characterized section 42300 as "authoriz[ing] every district board to establish a permit system requiring permits for the operation of *equipment* which causes air pollution." (*Id.*, at p. 1135, fn. 3; emphasis added.)

Unlike equipment or other items which cause air pollution, indirect sources do not, in and of themselves, emit pollutants. In that respect they may be distinguished from all other nonvehicular sources that are subject to district regulation. The only reference to indirect sources in the permitting statutory provisions is contained in subdivision (g) of section 42311:

"A district may adopt, by regulation, a schedule of fees to be assessed on areawide or indirect sources of emissions which are regulated, but for which permits are not issued, by the district to recover the costs of district programs related to these sources."

We believe that in section 42311, the Legislature has recognized indirect sources as essentially different from other sources of pollution and consequently has made them exempt from ordinary permitting requirements.

A further indication of legislative intent regarding district permits for indirect sources of pollution may be found in the provisions relating to district plans to attain state ambient air quality standards. Districts are divided into categories of those having moderate, serious, and severe air pollution. (§§ 40918, 40919, 40920.) For each category there is a prescribed set of measures to be included in the attainment plans for the districts in that category. Among them are transportation control measures (§§ 40918, subd. (a)(3); 40919, subd. (a)(3); 40920, subd. (a)(2)), provisions to develop area source and indirect source control programs (§§ 40918, subd. (a)(4); 40919, subd. (a)(1); 40920, subd. (a)(1)), and "a permitting program designed to achieve no net increase in emissions of nonattainment pollutants or their precursors from new or modified stationary sources which emit or have the potential to emit 25 tons per year or more." (§§ 40918, subd. (a)(1); 40919, subd. (a)(1); 40920, subd. (a)(1).)[3] In addition, districts with serious or severe air pollution are required to include in their attainment plans "[a] permitting program designed to achieve no net

---

3. An emitting facility within or associated with an indirect source (e.g., a dry cleaning establishment in a shopping center) would properly be considered a direct source in its own right.

increase in emissions of non-attainment pollutants or their precursors from all permitted new or modified stationary sources."  (§§ 40919, subd. (a)(2); 40920, subd. (a)(1).)

The term  "stationary source" is not defined in the relevant state statutes.  However, it has long been used in the federal Clean Air Act and is there defined as "any building, structure, facility, or installation which emits or may emit any air pollutant."  (42 U.S.C. § 7411(a)(3).)  As previously noted, an indirect source does not itself *emit* any air pollutants.  This distinction was found significant by the Court of Appeals in *South Terminal Corporation* v. *Environmental Protection Agency* (1st Cir., 1974) 504 F.2d 646, where the court stated:  "We agree with several petitioners that parking structures, which themselves emit no pollutants, but instead only attract vehicles which emit pollution, are not stationary sources within the meaning of the Act."  (Id., at p. 668, fn. 24.)  Thus, under the federal act, references to stationary sources are not deemed to include indirect sources.

In light of the Legislature's selective use of the term "stationary source" (see §§ 40918-40920, 42311) in place of the more frequently used term "nonvehicular source," we likewise believe that a "stationary source" is not meant to include an "indirect source" under the state statutory scheme.  Hence, permits may not be required of indirect sources under either the general permitting authority (§ 42300) or the special permitting authority provisions relating to the attainment of state ambient air quality standards (§§ 40910-40926).

The canon of statutory construction applicable here is *expressio unius est exclusio alterius* ["the expression of certain things in a statute necessarily involves exclusion of other things not expressed"].  (See *Dyna-Med, Inc.* v. *Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1391; *Henderson* v. *Mann Theatres Corp.* (1976) 65 Cal.App.3d 397, 403.)  "`"In the grants [of powers] and the regulation of the mode of exercise, there is an implied negative; an implication that no other than the expressly granted power passes by the grant; that it is to be expressed only in the prescribed mode . . . ."'"  (*Wildlife Alive* v. *Chickering* (1976) 18 Cal.3d 190, 196.)  The express statutory authority of districts to impose a permit system extends to objects and structures that directly cause the issuance of air contaminants, not indirect sources.

We are left to determine whether section 40716 itself impliedly supports a permitting process for indirect sources.  In this regard, it is to be observed that administrative agencies have only the power conferred upon them by statute, and an act in excess of those powers is void.  (*Ferdig* v. *State Personnel Bd.* (1969) 71 Cal.2d 96, 103-104; *Rich Vision Centers, Inc.* v. *Board of Medical Examiners* (1983) 144 Cal.App.3d 110, 114.)  We have recently determined that air pollution control districts lack the power to impose parking fees.  (75 Ops.Cal.Atty.Gen. 256 (1992); 74 Ops.Cal.Atty.Gen. 196 (1991).)  Of course, an agency's powers are not limited to those expressly granted in the legislation; rather, it is well settled that administrative officials "may exercise such additional powers as are necessary for the due and efficient administration of powers expressly granted by statute, or as may fairly be implied from the statute granting the powers."  (*Dickey* v. *Raisin Proration Zone No. 1* (1944) 24 Cal.2d 796, 810; see also *Stackler* v. *Department of Motor Vehicles* (1980) 105 Cal.App.3d 240, 245.)

The doctrine of implied administrative powers, however, is not without limitation.  "It cannot be invoked where the grant of express powers clearly excludes the exercise of others, or where the claimed power is incompatible with, or outside the scope of, the express power.  For a power to be justified under the doctrine, it must be essential to the declared objects and purposes of the enabling act -- not simply convenient, but indispensable.  Any reasonable doubt concerning the existence of the power is to be resolved against the agency."  (*Addison* v. *Department of Motor Vehicles* (1977) 69 Cal.App.3d 486, 498; see 68 Ops.Cal.Atty.Gen. 223, 224 (1985).)

Looking at the historical background with respect to the enactment of section 40716, we find that the federal Environmental Protection Agency (hereinafter "EPA") began its regulation of indirect sources in 1973, particularly "major highways and airports, large regional shopping centers, major municipal sports complexes or stadiums, major parking facilities, and large amusement and recreational facilities." (38 Fed. Reg. 15837 (1973).) The federal administrative regulation, referred to as "indirect source review," entailed requiring such facilities to obtain federally-controlled permits before construction or significant modification. (See *Natural Resources Defense Council* v. *U.S.E.P.A.* (D.C. Cir. 1984) 725 F.2d 761, 769.) EPA activity in this area "drew heavy criticism because [indirect source reviews] represented a significant federal intrusion into the traditionally local domain of land use control." (*Manchester Environmental Coalition* v. *E.P.A.* (2nd Cir., 1979) 612 F.2d 56, 58.) As a result, "Congress included in the 1977 amendments to the Clean Air Act a special provision severely limiting the EPA's authority over [indirect source reviews]. . . ." (*Ibid.*)

The 1977 amendment to the federal Clean Air Act banned federally-created indirect source review, but reserved the right to require, as a measure of last resort, that a state implementation plan include an indirect source review program. The design, implementation, and enforcement of this tool were left strictly to state and local governments and any land use control implications would be their responsibility.

Given this background, we may discern the Legislature's intent in enacting section 40716 in 1988. Because of the substantial interplay between the federal and state clean air requirements, we may assume that the Legislature was aware of the congressional objections to indirect source review when it provided specific authorization in section 40716 for local districts to adopt and implement regulations designed to reduce or mitigate emissions associated with indirect sources. In this light, the language contained in subdivision (b) of section 40716 may be seen as reflective of Congress' aversion to placing an undue regulatory burden on indirect sources.

While subdivision (b) of section 40716 ensures that a regulatory program for indirect sources may legally coexist with the traditional land use planning and control prerogatives exercised by cities and counties, even though the former may strongly influence land use decision making by cities and counties, it also indicates an intent to uphold the authority of cities and counties to plan and control land use. At the heart of such authority is the right to issue permits to control whether a given area within the city or county may be used for a particular purpose. (See Longtin, Cal. Land Use Regulations (2nd ed. 1987) § 1.01[2], pp. 11-12.) Thus, for example, if a city or county wishes to approve a developer's proposal for a new shopping center, it has sole authority to issue a permit for construction of the project. The developer's proposal must of course be consistent with the jurisdiction's general plan, including the circulation element, and may only be approved after review pursuant to the California Environmental Quality Act (Pub. Resources Code, § 21000, et seq.), but a permit for construction of the project as a whole need be obtained from only one public entity. Under section 40716, then, districts may not regulate indirect sources to the extent that such regulation would deprive cities and counties of the authority to approve or disapprove the use of land for a facility constituting an indirect source of pollution.[4]

_____

4. In *California Coastal Commission* v. *Granite Rock Co.* (1987) 480 U.S. 586, 590, a distinction was drawn between environmental regulation and land use planning: "Land use planning in essence chooses particular uses for the land; environmental regulation, at its core, does not mandate particular uses of land but requires only that, however the land is used, damage to the environment is kept within prescribed limits." In the absence of a federal preemption situation, the court upheld the state commission's use of a permit requirement to impose its environmental

As to whether operational permits may be required of the facility after construction, a closer question is presented, but the conclusion is the same. Starting with the statement of legislative intent regarding district plans to attain state ambient air quality standards, we note that although districts are to consider the full spectrum of emission sources, only "transportation" and "areawide" emission sources are singled out for special attention:

> "It is the intent of the Legislature in enacting this chapter that districts shall endeavor to achieve and maintain state ambient air quality standards for ozone, carbon monoxide, sulfur dioxide, and nitrogen dioxide by the earliest practicable date. In developing attainment plans and regulations to achieve this objective, districts shall consider the full spectrum of emission sources and focus particular attention on reducing the emissions from transportation and areawide emission sources. Districts shall also consider the cost effectiveness of their air quality programs, rules, regulations, and enforcement practices in addition to other relevant factors, and shall strive to achieve the most efficient methods of air pollution control. However, priority shall be placed upon expeditious progress toward the goal of healthful air." (§ 40910.)

Transportation sources are subject to the detailed provisions of section 40717 dealing with "transportation control measures." These measures are defined as "any strategy to reduce vehicle trips, vehicle use, vehicle miles traveled, vehicle idling, or traffic congestion for the purpose of reducing motor vehicle emissions." (§ 40717, subd. (g).) "Reasonably available" transportation control measures are to be included in district attainment plans pursuant to sections 40918, 40919, and 40920. (§ 40918, subd. (a)(3).) These sections, as previously noted, also call for the development of area source and indirect source control programs for inclusion in the plans but specify a permitting system *only* in connection with stationary sources. There is no indication in the statute that a permit system may be required to effectuate either indirect source control programs or transportation control measures.[5]

Of course, a district's regulations may require the developer of an indirect source to submit the plans to the district for review and comment prior to the issuance of a permit for construction by a city or county. A district may also require the owner of an indirect source to adopt reasonable post-construction measures to mitigate particular indirect effects of the facility's operation. Such regulations could be enforced through an action for civil penalties as prescribed in section 42403. In addition, the transportation control measures available to the districts would enable them to mitigate, on a broader basis, the same type of air quality impacts that are associated with indirect sources.

Although the ability to issue permits might well be helpful in ensuring timely or effective compliance with regulations pertaining to indirect sources, that alone is insufficient to meet

---

regulations on mining activity occurring on federally owned coastal property. Here, on the other hand, the demonstrably controversial history of indirect source controls and the specific inclusion in the regulatory statute of a provision to protect traditional city and county land use prerogatives leads us to believe that a district permit system which could prevent construction of a city or county approved indirect source facility is not supported by the rationale of the *Granite Rock* decision.

5. Indeed, much of the effect of indirect sources is already addressed in the city and county planning processes through the requirement of a congestion management plan for urbanized areas. (Gov. Code, § 65089.)

the test for invoking the doctrine of implied administrative powers. Because of the controversial nature of indirect source review and the statutory reference to permits solely in connection with stationary sources, imposition of a permitting system upon indirect sources lacks the definitive indication of legislative intent required by the courts.

In answer to the question presented, therefore, we conclude that districts may not impose a permit system upon indirect sources of air pollution.[6]

\* \* \* \* \*

---

6. This conclusion differs from that reached in 56 Ops.Cal.Atty.Gen. 531, 537 (1973):

"Accordingly, we conclude that air pollution control districts have broad authority to adopt rules and regulations necessary to implement the state and federal ambient air quality standards, including regulation of complex sources where such regulation is necessary to attain state or federal air quality standards. The extent of such regulatory authority would logically include the ability to prohibit the construction of complex sources."

Our 1973 conclusion preceded by several years the changes that were made in the federal Clean Air Act in response to the indirect source review controversy. It was also made at a time when no specific authorization for regulation of indirect sources (then known as "complex sources") appeared in California's air pollution statutes. In light of both the language contained in section 40716 and the recognized limitations on the implied administrative powers doctrine, we find that the last sentence in the above quoted conclusion no longer reflects current law.