Filed 5/28/14  Modified and certified for publication 6/18/14 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| SOUTHERN CALIFORNIA EDISON COMPANY,<br><br>      Petitioner,<br><br>      v.<br><br>PUBLIC UTILITIES COMMISSION,<br><br>      Respondent;<br><br>NATURAL RESOURCES DEFENSE COUNSEL et al.,<br><br>      Real Parties in Interest. | B246782 consolidated with B246786<br><br>(Cal.P.U.C. Dec. Nos.: D.11-12-035, D.13-01-016, D.12-05-037, D.13-04-030) |

ORIGINAL PROCEEDINGS in mandate.  Petitions denied.

Munger Tolles & Olson, Henry Weissmann, Nicholas Soltman; Michael Montoya, Jennifer Shigekawa and Rebecca Meiers-De Pastino for Petitioner.

Frank R. Lindh, Helen W. Yee, Carrie G. Pratt and Sophia J. Park for Respondent.

Michael J. Levy, Kristen Driskell, Melanie Moultry, Lisa Decarlo and Jeffery M. Ogata for California Energy Commission as Amicus Curiae on behalf of Respondent.

Jaclyn H. Prange, Noah Long and Michael E. Wall for Real Parties in Interest.

INTRODUCTION

At issue in this consolidated original proceeding is whether the Public Utilities Commission (the PUC) has the authority to implement the Electric Program Investment Charge (EPIC). EPIC requires electric utility corporations serving California to collect a surcharge on their ratepayers' electricity bills to fund renewable energy research, development, and demonstration projects with the aim of making electricity service cheaper, safer, and more reliable for the corporations' own ratepayers. Southern California Edison Co. (SCE), one of the three large investor-owned utilities required to collect the surcharge, petitioned for writ of review to challenge the PUC's two decisions creating EPIC. We hold that the PUC possesses the constitutional and statutory authority to implement EPIC; EPIC is not an unlawful delegation of the PUC's authority; and the surcharge is not a tax requiring legislative enactment, but a valid regulatory fee. Accordingly, we deny the writ petitions.

FACTUAL AND PROCEDURAL BACKGROUND

1. *Background*

As part of its deregulation of California's electricity industry in 1996 (Pub. Util. Code, § 330 et seq.),[1] the Legislature included in the Electric Utility Industry Restructuring Act a requirement that the PUC[2] direct utilities to collect revenue for electricity-related research and development through a surcharge on electricity sales, known as a system benefits charge. (§ 381.) The Legislature's express purpose was to provide funding for programs that, inter alia, enhance the reliability of the State's electric system and provide Californians with the benefits of energy efficiency and conservation,

---

[1]   All further statutory references are to the Public Utilities Code, unless otherwise noted.

[2]   The PUC is the administrative agency responsible for regulating the public utilities in California. (*Southern Cal. Edison Co. v. Public Utilities Com.* (2000) 85 Cal.App.4th 1086, 1091.)

2

research and development, and the operation of existing, and the development of new and renewable, resource technologies.  (§ 381, subds. (a) & (b).)

To finance the system benefits charge, the Legislature directed the PUC to order California's three large investor-owned utilities regulated by the PUC, i.e., SCE, Pacific Gas and Electric, and San Diego Gas and Electric,[3] to collect a nonbypassable charge - a fee that all consumers must pay – from ratepayers.  The charge is a flat fee-per-kilowatt-hour of usage, and is a separate component of electric bills, segregated from other revenue, to be used for these identified system benefits.  (§ 381, subds. (a) & (b).)

The requirement that utilities collect the system benefits charge originally expired in 2001.  (Former § 381, subd. (c).)  However, again declaring it to be the intent of the Legislature and the policy of the State to provide safe, reliable, affordable, and environmentally sustainable electric service by continuing to make prudent investments in energy efficiency, renewable energy, and research and development, the Legislature enacted section 399.8, popularly called the Public Goods Charge.  As with section 381, section 399.8 requires that customers of electrical corporations pay a nonbypassable charge to provide these public and system benefits.  (§ 399.8, subd. (b)(1).)  The Legislature directed the PUC to order the three electric corporations to collect per year starting in 2002, specific dollar amounts for (1) energy efficiency and conservation activities, (2) renewable energy, and (3) research, development and demonstration (RD&D), adjusted for inflation or growth in electric commodity sales.  (*Id*., subd. (d).) The statute assigns administrative duties for renewable energy and RD&D to the California Energy Resources Conservation and Development Commission (the CEC), while placing oversight responsibilities with both the PUC and the CEC.  (§§ 381 & 399.8, subd. (e); see also, Pub. Resources Code, §§ 25620 & 25740.5.)

The Legislature extended the funding levels for the Public Goods Charge through 2011.  (§ 399.8, subd. (c)(1).)  Specifically, section 399.8, subdivision (c) directed the

---

[3]  Local publicly-owned electric utilities are also subject to the same requirements pursuant to a separate authorization.  (§§ 385 & 399.8, subd. (b)(2).)  The publicly owned electric utilities' obligation is not at issue in this proceeding.

PUC to require each electrical corporation to collect the surcharge beginning January 1, 2002 and ending January 1, 2012. (§ 399.8, subd. (c)(1).)[4]

On the eve of the expiration, the Legislature once more considered whether to extend the Public Goods Charge funding in subdivision (c) of section 399.8. Despite a report by the Legislative Analysis's Office finding "a need for a continued state role" in electricity-related research and development, and recommending continued investment, the proponents in the Legislature did not garner the necessary supermajority of votes. (Assem. Bill No. 724 (2011-2012 Reg. Sess.).)

In 2011, Governor Brown sent a letter to the PUC requesting that it " 'take action under the [PUC's] authority to ensure that programs *like* those supported by the Public Goods Charge are instituted – and hopefully at their current levels.' "

2. *EPIC*

The PUC initiated a bifurcated rulemaking (R.11-10-003) to address whether and how to preserve funding for ratepayer benefits associated with the renewable electric energy and RD&D portions of the expiring Public Goods Charge. In Phase 1 (D.11-12-035), the PUC determined whether to continue to impose any charge for these programs, and if so, how much, how to impose it, and for how long. Phase 2 addressed more detailed program design, oversight, and administrative issues related to how the funding would be allocated and by whom.

After receiving comments and replies, the PUC issued the Phase 1 decision (D.11-12-035) adopting EPIC, a program to conduct RD&D into, and market support and facilitation of, cost-effective, safe, and reliable renewable energy sources and technology for the benefit of the electric corporations' ratepayers, and to fund the program through a

---

[4]    Prior to January 1, 2012, subdivision (c)(1) of section 399.8 read in full: "The [Public Utilities C]ommission shall require each electrical corporation to identify a separate rate component to collect revenues to fund [(1)] energy efficiency, [(2)] renewable energy, and [(3)] research, development and demonstration programs authorized pursuant to this section beginning January 1, 2002, and ending January 1, 2012. The rate component shall be a nonbypassable element of the local distribution service and collected on the basis of usage."

surcharge on those ratepayers commencing January 1, 2012. The PUC initially imposed EPIC on an interim basis, subject to refund, until either it issued its final decision in Phase 2, or until January 1, 2013, whichever came first.

The PUC determined its authority to institute EPIC lay in California Constitution, article XII, and sections 701 and 740, along with other statutes that promote renewable energy and RD&D programs (e.g., §§ 381, 399, 701.1, 701.3 & 8360), many of which authorities predate the Public Goods Charge. The PUC observed that EPIC was not a continuation of the section 399.8 Public Goods Charge, but a new surcharge for a different program within the PUC's existing constitutional and statutory authority. Among other differences, EPIC concerns renewable energy sources only, and does not include the energy efficiency or conservation components of the Public Goods Charge. The PUC reasoned that although the Public Goods Charge funding had expired, nothing prohibited it from adopting a different program.

The Phase 2 decision (D.12-05-037) issued six months later, extended EPIC through 2020 and established a detailed framework for oversight, administration, and use of the collected funds. The "primary and mandatory guiding principle" of EPIC is to "provide[] electricity ratepayer benefits, defined as promoting greater reliability, lower costs, [and] increased safety . . . ." Unlike the Public Goods Charge, which included funding for energy efficiency and conservation, the PUC limited EPIC to "provid[ing] public interest investments in applied research and development, technology demonstration and deployment, market support, and market facilitation, of *clean energy technologies* and approaches for the benefit of electricity ratepayers of . . . the three large investor-owned utilities." (Italics added.) "[C]lean energy technologies" includes "renewable generation . . . ." The PUC determined that the utilities should collect $162 million per year, which amount put EPIC at the same funding levels as the Public Goods Charge, minus the energy efficiency component. The PUC reasoned that without adequate funding, the benefits to ratepayers of any program for renewable energy technology and RD&D would be lost.

The Phase 2 decision set out a detailed procedure for administration of the EPIC funds by both the investor-owned utilities and the CEC. The PUC determined that the utility corporations should administer 20 percent of the revenue and use that money for technology demonstration and deployment activities on the electricity grid, which constitutes about 40 percent of the budget devoted to this activity, as the utilities own the infrastructure on which the technologies are being tested and may ultimately become the consumers of those technologies. The PUC assigned to the CEC the task of administering the remaining 80 percent of the funds based on the CEC's expertise in energy issues and experience in administering activities that are "pre-commercial in nature," including applied RD&D, and the CEC's disinterest in any particular company or solution. The PUC was also alert to assure that EPIC funds be used only for EPIC purposes by "protecting the [EPIC] funds . . . from potential diversion to other purposes unrelated to EPIC by the state budget." Accordingly, the PUC decided that administrative and staffing costs would be transferred by the utility corporations to the CEC on a quarterly basis. "[F]unding should not be used to support activities or efforts that are duplicative of efforts that are being undertaken elsewhere or that are more expensive than necessary to achieve the goals." And, taking into account SCE's endorsement, the PUC determined that funds used for grants or contracts with third parties would be transferred from the utility corporations to the CEC *only after* the contract or grant has been approved by the PUC. Finally, to protect the investor-owned electricity ratepayers, funds administered by the CEC are "not [to] be used for any purposes associated with [publicly owned utility] activities."

The PUC retains oversight and policymaking duties under EPIC. It reviews, modifies, and approves detailed investment plans the EPIC administrators, i.e., the CEC and the investor-owned utilities, must submit triennially. The investment plans must contain specific information to aid the PUC's evaluation and be sufficiently detailed to justify receipt of a grant of ratepayer funds from the PUC to the CEC. All grants and loans must meet the tight criteria approved by the PUC who expects a "clear nexus" with

6

the goals of cost, safety, and reliability benefits for the electricity corporations' ratepayers.

Very soon after the Phase 2 decision was issued, the Legislature enacted Public Resources Code sections 25710 through 25712, establishing the "Electric Program Investment Charge Fund" (the EPIC Fund), a special account in the State Treasury into which the EPIC money administered by the CEC is to be deposited. (Pub. Resources Code, § 25711.) Section 25711 requires the PUC to forward the EPIC Fund money to the CEC on a quarterly basis (*id*., subd. (b)), and requires the CEC to administer the EPIC Fund as directed by the PUC (*id*., subds. (a), (c) & (d)).

While this case was under consideration, on September 26, 2013, Governor Brown signed Public Resources Code sections 25711.5 and 25711.7 into law. Section 25711.5, effective September 26, 2013, requires the CEC, among other things, to award EPIC "funds for projects that will benefit electricity ratepayers and lead to technological advancement and breakthroughs to overcome the barriers that prevent the achievement of the state's statutory energy goals . . . ." (Pub. Resources Code, § 25711.5, subd. (a).) The statute also sets out the terms that are imposed as a condition for receipt of EPIC loans or grants, the reporting requirements, the process for tracking progress and outcomes, and the CEC's annual report to the Legislature, among other things. (*Id*., subds. (b)-(g).) Section 25711.7 precludes the PUC from collecting funds under EPIC in an annual amount greater than the amount set forth in the Phase 2 decision. (*Ibid.*)[5]

---

[5]    Public Resources Code section 25711.7 reads, "(a) The Public Utilities Commission shall not require the collection of funds pursuant to its Decision 12-05-037 (May 24, 2012), Phase 2 Decision Establishing Purposes and Governance for Electric Program Investment Charge and Establishing Funding Collections for 2013–2020, as corrected by Decision 12-07-001 (July 3, 2012), Order Correcting Error, and as modified by Decision 13-04-030 (April 18, 2013), Order Modifying Decision (D.) 12-05-037, and Denying Rehearing of Decision, as Modified, *in an annual amount greater than the amount specified in those decisions*. [¶]  (b)  This section does not modify, alter, or, in any way, affect the operation of Section 25712." (Italics added.)

7

3. *The instant proceeding*

SCE, who provides electrical service in portions of California (*Southern Cal. Edison Co. v. Public Utilities Com.*, *supra*, 85 Cal.App.4th at p. 1091), sought rehearing to challenge the PUC's Phase 1 and Phase 2 decisions. In response, the PUC issued D.13-01-016, which modified its Phase 1 decision to add authority for its actions, and denied rehearing.

Before the PUC addressed SCE's Phase 2 rehearing request, SCE filed two petitions for writ of review in this court. (§ 1756.) The first petition challenges the Phase 1 and rehearing decisions and the second petition challenges the Phase 2 decision. This court consolidated the two writ petitions and held them in abeyance pending the PUC's disposition of SCE's application for rehearing of the Phase 2 decision. Thereafter, the PUC issued D.13-04-030, which made immaterial modifications to its Phase 2 decision and denied rehearing. SCE filed its amended petition for writ of review challenging D.11-12-035, D.12-05-037, D.13-01-016, and D.13-04-030.[6]

DISCUSSION

1. *The standard of review*

Section 1756 allows litigants seeking to challenge decisions of the PUC to petition this court directly for a writ of review. (*Southern Cal. Edison Co. v. Public Utilities Com.*, *supra*, 85 Cal.App.4th at p. 1096.) The petitioner bears the burden to establish the grounds for setting aside the decision. (*Utility Consumers' Action Network v. Public Utilities Com.* (2010) 187 Cal.App.4th 688, 699.)

Our review of PUC decisions is limited to determining on the basis of the whole administrative record whether the PUC "acted without, or in excess of, its powers or jurisdiction," or "has not proceeded in the manner required by law." (§ 1757, subd. (a)(1) & (2).) There is no contention here that the PUC did not proceed according to law when

---

[6] SCE's first writ petition in Case No. B246782 challenges D.11-12-035 and D.13-01-016, the Phase 1 and rehearing decisions. SCE's writ petition in Case No. B246786 challenges D.12-05-037 and D.13-04-030, the Phase 2 and rehearing decisions.

8

implementing EPIC and so we are tasked only with determining whether EPIC falls within the PUC's authority.

As the PUC "is 'not an ordinary administrative agency, but a constitutional body with broad legislative and judicial powers.' . . . [, its] decisions are presumed valid. [Citations.]" (*Southern Cal. Edison Co. v. Public Utilities Com.*, *supra*, 85 Cal.App.4th at pp. 1096-1097; *Utility Consumers' Action Network v. Public Utilities Com.* (2004) 120 Cal.App.4th 644, 654.) "Generally, we give presumptive value to a public agency's interpretation of a statute within its administrative jurisdiction because the agency may have 'special familiarity with satellite legal and regulatory issues,' leading to expertise expressed in its interpretation of the statute. [Citation.]" (*Pacific Bell Wireless, LLC v. Public Utilities Com.* (2006) 140 Cal.App.4th 718, 729.) "Therefore, 'the PUC's "interpretation of the Public Utilities Code should not be disturbed unless it fails to bear a reasonable relation to statutory purposes and language . . . ." [Citation.]' " (*Ibid.*) When the issue is the scope of the PUC's jurisdiction, however, " ' "the general rule of deference to interpretations of statutes subject to the regulatory jurisdiction of agencies does not apply . . . ." ' " (*Ibid.*)

2. *The PUC has authority to implement EPIC.*

a. *EPIC is a proper exercise of the PUC's power.*

The PUC is a constitutional body "with far-reaching duties, functions and powers" notwithstanding it is a state agency. (*Consumers Lobby Against Monopolies v. Public Utilities Com.* (1979) 25 Cal.3d 891, 905 (*CLAM*), disagreed with on another point in *Kowis v. Howard* (1992) 3 Cal.4th 888, 897, fn. 2.) The California Constitution confers broad power on the PUC to regulate public utilities, which includes fixing rates and establishing rules for those utilities. (Cal. Const., art XII, § 6.) The PUC's authority "includes not only administrative but also legislative and judicial powers." (*San Diego Gas & Electric Co. v. Superior Court* (1996) 13 Cal.4th 893, 915 (*Covalt*); Cal. Const., art XII, § 6 ["[t]he commission may fix rates, establish rules, examine records, issue subpoenas, administer oaths, take testimony, punish for contempt . . . for all public utilities subject to its jurisdiction"].)

9

The PUC's powers are not limited to those expressly enumerated in the Constitution. (*CLAM*, *supra*, 25 Cal.3d at p. 905.) The Legislature has "plenary power" to confer additional authority on the PUC. (Cal. Const., art XII, § 5, italics added ["The Legislature has *plenary power, unlimited by the other provisions of this constitution* but consistent with this article, to confer additional authority and jurisdiction upon the [Public Utilities] commission . . ."].)

Pursuant to this plenary power, the Legislature enacted section 701 which vests the PUC with "expansive" authority (*CLAM*, *supra*, 25 Cal.3d at p. 905) to "supervise," to "regulate every public utility," and "*do all things . . .* which are *necessary and convenient* in the exercise of such power and jurisdiction," regardless of whether it is specifically designated in the Public Utilities Code "or *in addition thereto*."[7] (§ 701, italics added; *PG&E Corp. v. Public Utilities Com*. (2004) 118 Cal.App.4th 1174, 1198.)

"The primary limiting factor on PUC jurisdiction is that the PUC's action must be cognate and germane to utility *regulation*." (*PG&E Corp. v. Public Utilities Com.*, *supra*, 118 Cal.App.4th at p. 1201.) As long as "the authority sought is 'cognate and germane' to utility regulation, the PUC's authority under section 701 has been liberally construed. [Citations.]" (*Ibid.*, quoting from *CLAM*, *supra*, 25 Cal.3d at pp. 905-906 & *Covalt*, *supra*, 13 Cal.4th at p. 915.) The other important limitation on the authority conferred by section 701 is a specific statutory directive that *prohibits* the PUC's action. (*PG&E Corp.*, *supra*, at p. 1201; *Southern California Edison Co. v. Peevey* (2003) 31 Cal.4th 781, 792.)

Given the PUC's vast, inherent power to take any action that is cognate and germane to utility regulation, supervision, and rate setting, unless specifically barred by statute, there is no question that the PUC has the inherent authority to create EPIC and to impose fees necessary to carry out that program. EPIC directs electric utility

---

[7]     Section 701 reads: "The commission may supervise and regulate every public utility in the State and may do all things, whether specifically designated in this part or in addition thereto, which are necessary and convenient in the exercise of such power and jurisdiction."

corporations to invest in research into, and development of, renewable electric energy sources and technologies designed to lower costs, increase safety, and improve reliability of electricity service for the benefit of these corporations' own customers, and fixes a surcharge on those same ratepayers to recover the cost.

In addition to the PUC's inherent authority to implement EPIC, the Legislature has directed the PUC to develop renewable energy resources and technologies, much of which authority predates the Public Goods Charge and section 399.8. The Legislature declared that the principal goal of electric utilities' resource planning and investment "*shall* be to minimize the cost to society of the reliable energy services" that are provided by electricity, and "to improve the environment and to *encourage the diversity of energy sources* through," among other things, "*development of renewable energy resources*, such as wind, solar, biomass, and geothermal energy." (§ 701.1, subd. (a), italics added.)[8] Toward that end, the Legislature first mandates that the PUC "*shall direct* that a specific portion of future electric generating capacity needed for California be reserved or set aside for renewable resources" until the PUC "completes an electrical generation procurement methodology that values the environmental and diversity costs and benefits associated with various generation technologies." (§ 701.3, italics added.) Second, the Legislature commands that the PUC "*shall require* each electrical corporation to identify" a separate component of its rates "to collect the revenues used to fund . . . *programs*" that "enhance system reliability and provide in-state benefits," defined as, inter alia, "[i]n-state *operation and development of* existing and new and emerging eligible *renewable energy resources*." (§ 381, subds. (a), (b) & (b)(3), italics added.) Third, section 740 empowers the PUC to include in its rate-setting, expenses for

---

[8]     Additionally, in 2009, the Legislature enacted section 8360, which, among other things declared the policy of the State "to modernize the state's electrical transmission and distribution system to maintain safe, reliable, efficient, and secure electrical service, with infrastructure that can meet future growth in demand and achieve all of the following, which together characterize a smart grid: [¶] . . . [¶] (c) Deployment and integration of cost-effective distributed resources and generation, including *renewable resources*." (§ 8360, italics added.)

11

RD&D.  (§ 740.)  Sections 381, 701.3, and 740 are not simply policy goals as SCE argues.[9]  "Shall" is mandatory.  (*Common Cause v. Board of Supervisors* (1989) 49 Cal.3d 432, 443.)  The PUC's interpretation of these statutes is reasonably related to their purposes and language.  (*Pacific Bell Wireless, LLC v. Public Utilities Com.*, *supra*, 140 Cal.App.4th at pp. 729-730.)

Furthermore, EPIC is authorized by the remainder of section 399.8, which is still valid notwithstanding the sunset of the Public Goods Charge funding mechanism of subdivision (c).  Section 399.8 is found the Reliable Electric Service Investments Act (§§ 399 – 399.9, ch. 2.3, art. 15 (Article 15)), which sets forth the unmistakable intent of the Legislature and the policy of California to make "prudent investments" in "renewable energy, and research, development and demonstration" to "ensure that [Californians] continue to receive safe, reliable . . . environmentally sustainable electric service." (§§ 399.8, subd. (a); 399, subds. (b), (c) & (e)(4)-(e)(6).)[10]  To implement this legislative intent, section 399.8 continues to require that every customer of an electrical corporation pay a nonbypassable system benefits charge to fund, inter alia, such renewable energy and RD&D.  (§ 399.8, subd. (b)(1).)  More particularly, section 399.8 still directs that the

---

[9]     *Schenley Affiliated Brands Corp. v. Kirby* (1971) 21 Cal.App.3d 177, cited by SCE is distinguished because the "policy statute" there, former Business and Professions Code section 24749 had no implementing provision.  (*Schenley Affiliated Brands Corp. v. Kirby*, at p. 186.)  Here, by contrast, sections 399.8 and 381 have clear implementing provisions that continue in vitality notwithstanding the expiration of the funding mechanism in subdivision (c) of section 399.8.

[10]     Section 399, subdivision (e)(4) reads:  "California's in-state renewable energy resources help alleviate supply deficits that could threaten electric system reliability, reduce environmental costs associated with California's electricity consumption . . . ."  Section 399, subdivision (e)(5) states:  "California's public interest RD&D investments enhance private and regulated sector investment in electricity system technologies, and are designed specifically to help ensure sustained improvement in the economic and environmental performance of the distribution, transmission, and generation and end-use systems that serve California electricity users."  Section 399, subdivision (e)(6) provides:  "California has established a long tradition of recovering system benefits investments through usage-based electricity charges, which is reflected in at least two decades of electricity price regulation by the commission."

12

PUC "*shall order* San Diego Gas and Electric Company, Southern California Edison Company, and Pacific Gas and Electric Company to collect" system benefits charges (§ 399.8, subd. (d), italics added) and subdivision (b)(2) still requires that public utilities "shall continue to collect and administer system benefits charges pursuant to Section 385." Finally, section 399.8 continues to place administrative responsibilities with the PUC and the CEC. (§ 399.8, subds. (e) & (f).)

SCE disagrees that section 399.8 remains valid. Observing that the defunct subdivision (c)(1) funded the "programs authorized *pursuant to this section*" (italics added; see fn. 5 *ante*), SCE argues the expiration of section 399.8, subdivision (c)(1) necessarily "entails the expiration of the policy goals that are part of that program, as articulated in sections 381, 399, and 399.8, subdivision (a)," i.e., in Article 15. SCE opportunistically focuses on the words "programs authorized pursuant to this section" to argue that the failure to extend minimum funding levels for the Public Goods Charge somehow worked to gut the entirety of Article 15 of the Public Utilities Code. Not so. "[P]ursuant to this section" means just that; pursuant to section 399.8. We certainly cannot conclude from the mere failure to extend the funding in subdivision (c)(1) of section 399.8 that the Legislature intended to obliterate wholesale Article 15, The Reliable Electric Service Investments Act, or the policy declaration in section 399, or even the remainder of section 399.8. The Legislature knows how to clearly terminate an entire program and specify the impact on funding. The Legislature spelled out the elimination of an entire program in Education Code section 62000.2 (["The following *programs* shall sunset on June 30, 1987: [¶] . . . [¶] (c) Bilingual education" (italics added)]; see *Alejo v. Torlakson* (2013) 212 Cal.App.4th 768, 784 [effect of Ed. Code, § 62000.2 was to sunset the whole bilingual *program* and Ed. Code, § 62002 detailed impact on funding].) Although the Legislature could abolish the entire Reliable Electric Service Investment Act it had created, nothing in the mere failure to extend funding in subdivision (c) of section 399.8 spells out the elimination of the entire Public Goods Charge program. Had the Legislature intended to eliminate the whole of Article 15 or

13

even just the policy declaration and mandates in section 399.8, it would have done so more clearly and expressly.

We can discern no particular intent from the Legislature's failure to enact an extension of subdivision (c) of section 399.8. Courts "can rarely determine from the failure of the Legislature to pass a particular bill what the intent of the Legislature is with respect to existing law." (*Ingersoll v. Palmer* (1987) 43 Cal.3d 1321, 1349, fn. omitted; *Grupe Development Co. v. Superior Court* (1993) 4 Cal.4th 911, 922-923; *Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1396 ["Unpassed bills, as evidences of legislative intent, have little value"].) Without an explicit and clear declaration that it intended to reverse itself on longstanding electric energy policy and directives to the PUC, we decline to infer from the failure to extend funding levels for the Public Goods Charge that the Legislature intended to repeal its repeated declarations of State policy and its directives to the PUC -- in multiple parts of the Public Utilities Code -- to invest in and develop safe, reliable, renewable energy, RD&D, and the system benefits charge. (§§ 381, 399, 399.8, subd. (a).)

Indeed, not only has the Legislature directed the PUC to promote renewable energy technology and RD&D through programs funded by a rate surcharge, but it has not enacted legislation to prohibit EPIC. We reject any suggestion by SCE that the failure to extend the funding mechanism in subdivision (c)(1) of section 399.8 functions to bar EPIC. Courts uphold actions cognate and germane to utility regulation "absent a *specific legislative directive prohibiting the PUC from enforcing conditions it is empowered to impose.*" (*PG&E Corp. v. Public Utilities Com.*, *supra*, 118 Cal.App.4th at p. 1201, italics added.) As our Supreme Court explained, "[i]f PUC lacked substantive authority to [take the action at issue there], it was not for lack of inherent authority, but because this [action] *was barred by some specific statutory limit on PUC's power to set rates*. [Citation.]" (*Southern California Edison Co. v. Peevey*, *supra*, 31 Cal.4th at p. 792.) The mere failure to pass legislation is manifestly not the equivalent of "a specific legislative directive prohibiting" EPIC. (*PG&E Corp. v. Public Utilities Com.*, *supra*, at p. 1201.) Certainly, the Legislature could have barred EPIC. At the same time it enabled

14

the implementation of EPIC in Senate Bill No. 96 (enacting Pub. Resources Code, §§ 25711.5 & 25711.7), the Legislature barred the PUC's action with respect to several non-EPIC programs. (Sen. Bill No. 96, *supra*, ch. 356, §§ 46 [enacting § 854.5 stripping PUC of authority to establish a non-state entity with non-shareholder money or to enter into contracts with non-state entities]; 47 [enacting § 2120 restricting PUC's ability to distribute, expend, or encumber money received by the PUC as the result of a PUC proceeding or judicial action].) No legislative enactment expressly prohibits the PUC from collecting the EPIC surcharge.

A good example of a specific statutory directive *prohibiting* the PUC's action is Assembly Bill No. 1338 (2007-2008 Reg. Sess.) chapter 760, section 27. By way of background, in April 2008, the PUC created the California Institute for Climate Solutions (the CICS) and directed the CICS to administer grants for research on reducing greenhouse gases and adapting to climate change. Three months later, the Legislature passed Assembly Bill 1338, section 27, which states: "The Public Utilities Commission *shall not* execute an order, or *collect any rate revenues*, in Rulemaking 07-09-008 (Order Instituting Rulemaking to establish the California Institute for Climate Solutions), *and shall not adopt or execute any similar order or decision establishing a research program for climate change unless expressly authorized to do so by statute.*" (Italics added.) Assembly Bill 1338 specifically prohibits the CICS but does not address EPIC, SCE's contention notwithstanding. Unlike the CICS, EPIC is not a research program for climate change. It is a program to fund electricity-related research and development activities to benefit the electricity corporations' ratepayers. That some approved research projects may result in innovations that reduce greenhouse gases, does not transform EPIC into a research program for climate change prohibited by Assembly Bill No. 1338.[11]

---

[11]     SCE suggests that EPIC is prohibited by Assembly Bill No. 1338 because EPIC is similar to CICS. SCE argues: the PUC "expressly stated that activities supported by EPIC 'should advance the objectives of AB 32.' [Citation.] AB 32, the California Global Warming Solutions Act of 2006, was designed to reduce greenhouse gas emissions [citation], and hence EPIC is a 'research program for climate change" similar to the CICS." But SCE's quote here is from the staff proposal, which the PUC did not adopt.

Accordingly, although it prohibited the CICS, Assembly Bill No. 1338 does not even begin to bar EPIC.

To the contrary, the Legislature ratified EPIC by creating the EPIC Fund in the State Treasury as soon as the PUC created the program, and again when it set forth criteria for the CEC and limited the funding levels to those set in the PUC's decisions. (Pub. Resources Code, §§ 25711, 25711.5, & 25711.7.)  Public Resources Code sections 25711 through 25711.7 do not create PUC jurisdiction to implement EPIC.  Rather, these successive statutes make plain the Legislature's approval of EPIC irrespective of the outcome of this proceeding.  (*Professional Engineers in California Government v. Schwarzenegger* (2010) 50 Cal.4th 989, 1000, 1044, 1050-1052 [revised 2008 Budget Act does not grant Governor authority to impose unpaid furloughs on certain executive branch employees, but language in bill embodies Legislature's ratification or endorsement of plan already in effect].)[12]

---

The PUC decided instead that greenhouse gas reduction merely "complements" the benefits of EPIC.  Simply because the reduction in greenhouse gas emissions is a complementary goal does not transform EPIC into a research program for climate change barred by Assembly Bill No. 1338.

[12]      SCE repeatedly quotes from Public Resources Code section 25712, that creating the EPIC Fund did not "detract from, any existing authority of the Public Utilities Commission to levy or increase charges." (Pub. Resources Code, § 25712.)  SCE implies that this declaration supports its position that the Legislature did not intend to endorse EPIC.  On the contrary, "[p]rior decisions have stated that ' " ' "the budget bill may deal only with the one subject of appropriations to support the annual budget," ' and thus ' "may not constitutionally be used to grant authority to a state agency that the agency does not otherwise possess" ' or to " ' substantively amend [ ] and chang[e] existing statute law." ' " ' [Citations.]  [The statute at issue] however . . . *does not substantively amend or change any existing statutory provision or expand or restrict the substantive authority of any state agency*, and cannot reasonably be described as a substantive policy change 'masquerading as [a] Budget Act provision[ ].' [Citation.]" (*Professional Engineers in California Government v. Schwarzenegger*, *supra*, 50 Cal.4th at pp. 1049-1050.)  Hence, the Supreme Court makes clear that the language italicized above, similar to that contained in Public Resources Code section 25712 and cited by SCE, is a legislative recognition of the PUC's authority to impose EPIC.

16

In sum, EPIC is cognate and germane to the PUC's inherent power to regulate and supervise utilities as the program governs the cost, safety, and reliability of electricity provided by electric utility corporations, and fixes rates.  In addition, the PUC has explicit authority to require utilities to collect a system benefits charge for renewable energy and RD&D projects.  Finally, rather than to prohibit it, the Legislature has twice endorsed EPIC.

      b.  *SCE's remaining arguments are unavailing*.

SCE disputes that section 740 provides PUC authority for EPIC.  It reasons that together, sections 740, 740.1 and 740.3 "authorize the [PUC] to set rates to reimburse utilities for the costs *the utilities* incur for RD&D" because, it argues, section 740.1 concerns "*programs proposed by electrical and gas corporations*."  Section 740.1 reads, "The commission shall consider the following guidelines in evaluating the research, development, and demonstration programs *proposed by electrical* and gas *corporations*." (Italics added.)  Nothing in these statutes limits the PUC to surcharging rates only for RD&D that is proposed by electrical corporations.  Section 740.1 provides simply that *if* a utility corporation proposes an RD&D project, the PUC must consider the statute's guidelines in evaluating that program.[13]  Nor is section 740 so specific or limited.  As noted, section 740 reads, "For purposes of setting the rates to be charged by every electrical corporation, gas corporation, heat corporation or telephone corporation for the services or commodities furnished by it, *the commission may allow the inclusion of expenses for research and development*."  (Italics added.)  Read together, as SCE observes we must do (*Medical Board v. Superior Court* (2001) 88 Cal.App.4th 1001,

---

[13]    SCE quotes from the Phase 2 decision to demonstrate the PUC's rejection of section 740.1 as authority for its action.  It quotes the PUC as having stated it would " 'not formally adopt these criteria [in § 740.1] to apply to EPIC.' "  But, SCE did not give the full quotation.  The PUC stated, "We also agree with PG&E that § 740.1 and § 8360 provide useful guidance on expending ratepayer funding for RD&D.  *We will not formally adopt these criteria to apply to EPIC, but we will require that the administrators address the applicability of this statutory guidance in each investment plan*."  (Italics added.)

17

1013), section 740 authorizes the PUC to allow inclusion of expenses for research and development when setting rates and section 740.1 sets forth the criteria for the PUC to consider when evaluating RD&D proposals *made by the utilities*.[14] These statutes do not limit the PUC to authorizing charges for utility-proposed RD&D only.[15] Obviously, EPIC does not conflict with section 740; that statute permits the PUC to include RD&D costs in rate setting. More important, EPIC RD&D is otherwise authorized by sections 381, subdivision (b)(2), and 399.8, subdivision (b)(1).

SCE contends that the PUC lacks authority to establish EPIC because, it reasons, notwithstanding section 701 authorizes the PUC to regulate and supervise utilities, that utility regulation "means the regulation of the operation of the utilities," which regulation SCE asserts is really only "set[ting] rates." SCE argues that EPIC is different from traditional regulation because EPIC funds are paid to private parties for RD&D rather than to SCE, and so the PUC is not regulating the utility's operations so much as its "billing operations." Thus, SCE argues, the EPIC revenues are not being used for purposes related to SCE's utility operations or expenses.

The PUC's power is not as restricted as SCE paints it. The PUC's authority extends beyond mere rate-making. (*CLAM*, *supra*, 25 Cal.3d at p. 905) To "regulate" means to "govern or direct according to rule" or "to bring under the control of law or constituted authority." (Webster's 3d New Internat. Dict. (16th ed. 1971) p. 1913, col. 3.) Regulating is exactly what the PUC is doing by acting pursuant to sections 701, 701.1,

---

[14] We are at a loss to understand how section 740.3 supports SCE's position. That statute directs the PUC -- *together with* the CEC, *and* numerous other state boards *and* local districts, *along with* the regulated electrical *and* gas corporations, *and* the motor vehicle industry -- to promote the development of electric power and natural gas for fuel low-emission vehicles. That statute clearly does not require that private industry be the sole party to propose RD&D.

[15] *Southern Cal. Gas Co. v. Public Utilities Com.* (1979) 24 Cal.3d 653, does not undermine the authority provided by section 740. In that case, the Supreme Court held that sections 701 and 702 could not be interpreted to allow the PUC to institute a mandatory program where the Legislature had created a permissive one. (*Southern Cal. Gas Co. v. Public Utilities Com.*, at p. 659.)

18

701.3, 399.8 and 740 to implement a program for the research, development, and application of renewable electricity sources and technologies – activities directly related to SCE's operations -- for the benefit of the electricity corporations' ratepayers and to recover the cost through a rate surcharge on those same ratepayers. This is not a novel exercise of PUC authority. In *Covalt*, the Supreme Court established that section 701 and other statutes empowered the PUC to adopt policies about whether the conduct of electric utilities are a risk to public health; and to order utilities to participate in research into exposure patterns, engineering, and policy options, and to recover the cost of that research from ratepayers. (See *Covalt*, *supra*, 13 Cal.4th at pp. 923, 933-935.) SCE's suggestion that the research in *Covalt* was to be conducted only by the *utilities* is unsupported. The PUC in *Covalt* directed the utility corporations to "*participate* in education and research programs" and "to *participate* in an experimental research program to be conducted by the federal government." (*Re Potential Health Effects of Electric and Magnetic Fields of Utility Facilities* (1993) 52 Cal.P.U.C.2d 1, 21, 26, & 30, italics added; see also *Covalt*, *supra*, at pp. 933-934.) Clearly, therefore, EPIC, which directs utility corporations to administer research programs, falls within the PUC's authority.

SCE contends that the PUC has no authority to establish EPIC to collect revenue from ratepayers *on behalf of the CEC or recipients of grants*, which are not utilities and which the PUC does not have the jurisdiction to regulate.[16] The assertion is wrong. The programs the Supreme Court recognized in *Covalt* were administered by the *Department of Health Services* (DHS) *and the federal government*. (*Covalt*, *supra*, 13 Cal.4th at pp.

---

[16] For this proposition, SCE cites *CLAM*, *supra*, 25 Cal.3d at pages 911-912, which case it argues rejected the assertion that section 701 authorizes the PUC to direct utilities to pay attorney's fees of those who participate in ratemaking proceedings. But, SCE overlooks the first part of the *CLAM* opinion holding that the PUC *does have the authority* to award attorney fees and costs to *public interest participants*, i.e., to third parties, in quasi-*judicial* reparations cases (*CLAM*, at pp. 897 & 908), but not in quasi-*legislative* ratemaking proceedings (*id*. at p. 909). SCE also cites *PG&E Corp. v. Public Utilities Com.*, *supra*, 118 Cal.App.4th 1174 for this proposition. Yet, *PG&E Corp.* upheld the PUC's authority to regulate utility holding companies. (*Id*. at p. 1201.)

19

926, 933-935; *Re Potential Health Effects of Electric and Magnetic Fields of Utility Facilities*, *supra*, 52 Cal.P.U.C.2d at pp. 14, 21 & 26 ["The research and education programs which we are adopting today will be implemented in large part by the DHS, who we are naming as the research and education program managers"].) Furthermore, section 399.8 continues to direct that both the PUC and the CEC administer the Public Goods Charge (§ 399.8, subds. (e) & (f)) and the Legislature has endorsed the CEC's administrative role in EPIC. (Pub. Resources Code, §§ 25711, 25711.5, 25711.7.) Factually, the PUC is not regulating the CEC as a utility. As amicus observes, the CEC's role is to administer EPIC *for the PUC*. EPIC establishes a surcharge to provide cost-effective, safe, and reliable renewable energy sources *for the benefit of the electric corporations' ratepayers*. Apart from the fact that EPIC requires *the utilities* to administer 20 percent of the revenue, negating the contention EPIC is entirely run by another state agency, the PUC maintains tight control over the EPIC program through its oversight and approval power, SCE's suggestion to the contrary notwithstanding.

SCE also relies on a Legislative Counsel opinion written in July 2012 determining the PUC did not have the authority to impose EPIC. The opinions of the Legislative Counsel are not binding on this court. (*People v. $31,500 United States Currency* (1995) 32 Cal.App.4th 1442, 1461.) "Opinions of the Legislative Counsel ordinarily are 'prepared to assist the Legislature in its consideration of *pending* legislation' [citation], and therefore such opinions often shed light on legislative intent." (*St. John's Well Child & Family Center v. Schwarzenegger* (2010) 50 Cal.4th 960, 982, italics added.) However, when the Legislative Counsel's opinion addresses a matter other than pending legislation, such as when the opinion expresses a view concerning the constitutionality of an action taken by another branch of government, "it is entitled to no more weight than the views of the parties." (*Ibid.* [post-enactment opinion by Legislative Counsel that Governor exceeded his authority in vetoing items in bill entitled to "no more weight than the views of the parties"].) Here, the opinion SCE cites was written by the Legislative Counsel two weeks *after* the Legislature endorsed EPIC by creating the EPIC Fund (Pub. Resources Code, § 25711); and the opinion discusses a view about the PUC's

20

authority, not that of the Legislature, to impose EPIC. The Legislature did not thereafter revoke or amend the EPIC-Fund legislation; it went on to enact Public Resources Code sections 25711.5 and 25711.7. We give this Legislative Counsel opinion no more weight than the arguments of the parties here and disagree with its conclusions.

Accordingly, none of SCE's arguments is persuasive.

3. *EPIC does not involve an unlawful delegation of authority from the PUC to the CEC.*

SCE contends that under EPIC, the PUC "orders the transfer of EPIC funds to the CEC, which has the discretion to award RD&D grants." It asserts, citing the Phase 1 decision, that the PUC "explicitly states that it will '*transfer*' responsibility to the CEC*," and argues that this establishes that the PUC is "unlawful[ly] "delegating its authority to the CEC." (Italics added.)

SCE is factually incorrect. The Phase 1 decision, from which SCE purports to quote, did not create EPIC's administrative process; that was accomplished in the Phase 2 decision. Moreover, SCE misquotes the language cited in Phase 1. There, the PUC acknowledged that it "*cannot delegate its authority and responsibility* to determine recoverable costs, programs rules, regulations and policies," but "does have authority to *transfer the day to day administration of a program*, as it does with a variety of programs." (Italics added.)

Nor is SCE's legal argument persuasive. Generally, "powers conferred upon public agencies and officers which involve the exercise of judgment or discretion are in the nature of public trusts and cannot be surrendered or delegated to subordinates in the absence of statutory authorization. [Citations.]" (*California Sch. Employees Assn. v. Personnel Commission* (1970) 3 Cal.3d 139, 144.) However, an agency's delegation is lawful if "there has been no 'total abdication' of . . . authority." (*Taylor v. Crane* (1979) 24 Cal.3d 442, 452.) Thus, "public agencies may delegate the performance of ministerial tasks" (*California Sch. Employees Assn. v. Personnel Commission*, *supra*, at pp. 144-145) while retaining for themselves general policymaking power to determine the terms and conditions. (*Taylor v. Crane*, *supra*, at p. 453.) "Moreover, an agency's subsequent

21

approval or ratification of an act delegated to a subordinate validates the act, which becomes the act of the agency itself. [Citations.]" (*California Sch. Employees Assn. v. Personnel Commission*, *supra*, at p. 145.)

Based on these authorities, the PUC has not unlawfully delegated authority to the CEC. EPIC designates *both* the CEC *and the* utilities as administrators of EPIC, while the PUC retains oversight and control of the funding, grants and loans, and policy. Under EPIC, the detailed investment plans of the dual administrators must be approved triennially by the PUC, who may modify the plans if necessary. Those plans must be presented with a "high level of detail" and address specific items of mapping, the amount of funds to be allocated to particular programs, justifications for the allocation proposed, informational summaries, the type of funding mechanism, and eligibility criteria metrics, among other things. Additionally, there will be an "independent evaluation of the EPIC program to be conducted in 2016." The PUC only allows the extension of grants and loans showing the required nexus to program goals. That the CEC may shift up to 5 percent of the funds between *categories*, as SCE observes, for administrative flexibility undermines neither the CEC's obligation to use the funds for EPIC purposes nor the PUC's power to oversee the entire program.[17] Shifted funds remain in EPIC and may only be shifted among pre-approved categories. Nor has SCE pointed to any statute that *prohibits* the PUC from delegating the day-to-day administration to the CEC. To the contrary, the Legislature has ratified EPIC (Pub. Resources Code, §§ 25710-25711), and specifies that the *CEC* "*shall* administer" the EPIC Fund (Pub. Resources Code, § 25711, subd. (a), italics added), and directs that the CEC follow very specific criteria in

---

**17** The PUC had originally proposed giving the EPIC administrators discretion to shift up to *10 percent* of program funds from one category to another to give the administrator discretion in case unexpected opportunities arise. Both *San Diego Gas & Electric and PG&E conceded that some flexibility was warranted*. The PUC agreed with San Diego Gas & Electric's suggestion to reduce the limit to 5 percent and explained that the discretion to shift these funds was not a delegation of the PUC's discretionary authority but an administrative practicality, as without such flexibility, money could go unspent or cause delay for small changes.

22

developing and implementing EPIC (Pub. Resources Code § 25711.5). In short, not only has the PUC retained its oversight authority, but its review and approval process functions as a ratification of the administrators' actions. As a consequence, EPIC does not constitute an unlawful delegation of authority.

The PUC is acutely aware of the difference between delegable program administration and nondelegable policy and oversight duty. In *In re Distributed Generation and Distributed Energy Resources* (Cal.P.U.C., Jan. 12, 2006) 2006 WL 162584, the PUC "use[d] the term program oversight to mean those activities that involve formal decision-making on program elements, funding levels and ratemaking, which are the lawful obligations of the [Public Utility] Commission . . . . [By contrast, p]rogram administration involves day-to-day operations requiring little discretion and in compliance with state rules and decisions." (*Id*. at p. *5.) This expression of terms is entirely consistent with the PUC's approach in EPIC, which in turn complies with *Taylor* and *California Sch. Employees Assn*., as the PUC retains policymaking authority to determine terms and conditions while delegating the administrative tasks to the utilities and the CEC. (*Taylor v. Crane*, *supra*, 24 Cal.3d at p. 453; *California Sch. Employees Assn. v. Personnel Commission*, *supra*, 3 Cal.3d at pp. 144-145; See also *In re Commission's Future Energy Efficiency Policies* (Cal.P.U.C., Jan. 27, 2005) 2005 WL 391315, at pp. *4, *28-*29 [PUC concerned it could not exert policy and oversight control over independent administrators through contractual relationships].)

4. *EPIC is not an unlawful tax under Propositions 13 and 26, and does not violate the Separation of Powers Clause.*[18]

a. *Propositions 13 and 26*

In 1978, the California voters approved Proposition 13 adding article XIII A to the California Constitution. (*Sinclair Paint Co. v. State Bd. of Equalization* (1997) 15 Cal.4th 866, 872-873 (*Sinclair Paint*). Section 3 of article XIII A requires, inter alia,

---

[18]    After oral argument, we permitted the parties to submit supplemental briefs to address authorities not previously discussed in their original briefs.

that any act increasing taxes must be passed by a two-thirds vote of the Legislature. (*Sinclair Paint*, at pp. 872-873.)

In 2010, the voters approved Proposition 26, which adjusted the meaning of the term "tax" to include certain fees and charges, and shifted to state or local government the burden of demonstrating that any charge, levy, or assessment is not a tax. (Cal. Const., art. XIII A, § 3; *Schmeer v. County of Los Angeles* (2013) 213 Cal.App.4th 1310, 1322.)  Now, article XIII A, section 3 requires a vote of two-thirds of the Legislature for "[*a*]*ny change in state statute* which results in any taxpayer paying a higher tax," unless an exception applies.  (Cal. Const., art. XIII A, § 3, subd. (a), italics added.)[19]  The determination whether impositions are "taxes" on the one hand or regulatory "fees" on the other, is a legal question for this court to decide de novo. (*Sinclair Paint*, *supra*, 15 Cal.4th at p. 874.)

SCE contends that EPIC is a "tax," and as such, violates article XIII A, section 3. Starting with the premise that the Legislature clearly considered the Public Goods Charge a tax because it failed to extend the funding levels in subdivision (c) of section 399.8 by a supermajority, SCE then attempts to demonstrate how EPIC does not fall within any of the enumerated exceptions to the definition of tax in Proposition 26.  SCE further asserts that we may not rely on the definition of a regulatory fee in *Sinclair Paint*, *supra*, 15 Cal.4th 866, as that case predates Proposition 26, which measure was enacted to undercut that opinion.

The term " ' "tax" has no fixed meaning [and] the distinction between taxes and fees is frequently "blurred," taking on different meanings in different contexts.' " (*California Farm Bureau Federation v. State Water Resources Control Bd*. (2011) 51 Cal.4th 421, 437 (*California Farm Bureau*).)  Generally, "tax" "refers to a compulsory

---

[19]     California Constitution article XIII A, section 3, subdivision (a) reads in full: "Any change in state statute which results in any taxpayer paying a higher tax must be imposed by an act passed by not less than two-thirds of all members elected to each of the two houses of the Legislature, except that no new ad valorem taxes on real property, or sales or transaction taxes on the sales of real property may be imposed."

payment made to the government or remitted to the government. Taxes ordinarily are imposed to raise revenue for the government. [Citations.]" (*Schmeer v. County of Los Angeles*, *supra*, 213 Cal.App.4th at p. 1326 [holding ordinance requiring stores to charge customers 10 cents per plastic carryout bag not a tax because revenue not remitted to county].)

A regulatory fee, in contrast, "may be charged by a government entity so long as it does not exceed the reasonable cost of providing services necessary to regulate the activity for which the fee is charged." (*California Farm Bureau*, *supra*, 51 Cal.4th at p. 437; *Sinclair Paint*, *supra*, 15 Cal.4th at pp. 874-875; *Schmeer v. County of Los Angeles*, *supra*, 213 Cal.App.4th at p. 1321-1322.) Tracking this pre-*Sinclair Paint* definition, Proposition 26 excepts from the ambit of a tax, among other things, "A charge imposed for a specific benefit conferred or privilege granted directly to the payor that is not provided to those not charged, and which does not exceed the reasonable costs to the State of conferring the benefit or granting the privilege to the payor." (Cal. Const., art. XIII A, § 3, subd. (b)(1).) As long as the fee meets this definition, it is a legitimate regulatory fee rather than a tax, even if compulsory. (*Sinclair Paint*, *supra*, 15 Cal.4th at p. 874.)

We conclude EPIC is not a tax. Proposition 26 plainly defines a tax as a "*change in state statute* which results in . . . a higher tax" (Cal. Const., art. XIII A, § 3, subd. (a), italics added), not to a commission's decision to regulate utility corporations' RD&D into renewable energy for their own electricity customers and to charge a fee to pay for that activity. (*Western States Petroleum Assn. v. Board of Equalization* (2013) 57 Cal.4th 401, 423-424 [Prop. 26 in Cal. Const, art. XIII A, § 3, subd. (a) "[b]y its terms . . . applies only to a '*change in state statute* which results in any taxpayer paying a higher tax' " not to "an agency's decision to modify an administrative rule" (italics added)].) EPIC was not created by a *change in a state statute*. To be sure, the Legislature recognized *it* could only extend the Public Goods Charge in section 399.8, subdivision (c) by a vote of at least two-thirds of both of its houses. But, EPIC is not the Public Goods Charge and not a state statute designed to "result in a higher tax."

This is because EPIC is a valid regulatory fee. Proposition 26 places on "[t]he State . . . the burden of proving by a preponderance of the evidence that a levy, charge, or other exaction is not a tax, that the amount is no more than necessary to cover the reasonable costs of the governmental activity, and that the manner in which those costs are allocated to a payor bear a fair or reasonable relationship to the payor's burdens on, or benefits received from, the governmental activity." (Cal. Const., art. XIII A, § 3, subd. (d).)

"[N]early verbatim" language was used before Proposition 26 was passed to assess whether a charge was a tax on the one hand, or a special tax or regulatory fee on the other hand. (*Griffith v. City of Santa Cruz* (2012) 207 Cal.App.4th 982, 996.) *Griffith* explained, "As stated in *San Diego Gas & Electric Co. v. San Diego County Air Pollution Control Dist.* (1988) 203 Cal.App.3d 1132, 1145–1146, 'A "special tax" under section 4 [of California Constitution article XIII A] does not embrace fees charged in connection with regulatory activities which do not exceed the reasonable cost of providing services necessary to the activity for which the fee is charged and are not levied for unrelated revenue purposes. [Citations.]' " (*Griffith v. City of Santa Cruz,* at p. 996*.*) To show a fee is not a tax, the State must show that " ' "(1) the estimated costs of the service or regulatory activity, and (2) the basis for determining the manner in which the costs are apportioned, so that charges allocated to a payor bear a fair or reasonable relationship to the payor's burdens on or benefits from the regulatory activity." ' " (*California Farm Bureau*, *supra*, 51 Cal.4th at pp. 436-437, quoting from *Sinclair Paint*, *supra*, 15 Cal.4th at p. 878 & *California Assn. of Prof. Scientists v. Department of Fish & Game* (2000) 79 Cal.App.4th 935, 945 [applying *Sinclair Paint* test].) As *California Farm Bureau* observed, "[t]he scope of a regulatory fee is somewhat flexible and is related to the overall purposes of the regulatory governmental action." (*California Farm Bureau,* at p. 438, italics added.) To be valid, a fee must be linked to, but not exceed, the overall cost of the government's regulation. "*An excessive fee that is used to generate general revenue becomes a tax.*" (*Ibid.*, italics added.)

Utilizing this test, which dates back to 1988, there are many kinds of fees and charges that have been held not to be "taxes." (*Sinclair Paint*, *supra*, 15 Cal.4th at pp. 874-875, and cases cited therein.) *Sinclair Paint* held a charge similar to the aims of EPIC, namely to mitigate actual or anticipated adverse effects of the fee payor's operations, when it bears a reasonable relationship to those adverse effects, would be a regulatory fee and not a tax. (*Id*. at pp. 869-870, 877, 881.) *Evans v. City of San Jose* (1992) 3 Cal.App.4th 728, held that a charge on downtown businesses to decorate and provide music to attract more business was not a tax because the "promotion inures to the benefit of businesses and landlords within the BID because [in making] the downtown area a safer, cleaner, and more economically viable area," "the business license holder is specially benefitted . . . ." (*Id*. at p. 739.) Finally, *California Farm Bureau* held that a charge imposed on water appropriators by the State Water Resources Control Board was not a tax because the fee in that case did not authorize the collection of any more than the administrative costs incurred. (*California Farm Bureau*, *supra*, 51 Cal.4th at pp. 438-440.)

After the passage of Proposition 26, *Griffith v. City of Santa Cruz*, *supra*, 207 Cal.App.4th 982 addressed the question whether fees associated with an ordinance calling for annual inspections of all unoccupied residential rental properties within the city limits was an invalid tax. (*Id*. at p. 995 [analyzing Proposition 218, Cal. Const., art. XIII D, containing the same test as Proposition 26].) Applying the 1988 test just cited, *Griffith* held the fees before it were "expressly exempted from the Proposition 26 definition of 'tax' " because the city proved that the fees were "imposed to cover the cost of performing inspections." (*Griffith*, at p. 997.)

Likewise, EPIC is a regulatory fee and not a tax. The PUC has demonstrated that the fees charged in connection with EPIC do not exceed that necessary to cover the RD&D into renewable energy as the fees mirror the amounts in the Public Goods Charge minus the energy efficiency component and the Legislature has since approved that amount. (Pub. Resources Code, § 25711.7.) Furthermore, the PUC demonstrated that EPIC bears a reasonable relationship to the ratepayers' benefits because the charge is

27

designed to benefit the utility corporation's ratepayers only by making their electricity cheaper, safer, and more reliable. The remaining ratepayers, those of California's public utilities, are still obligated to pay their own system benefits and Public Goods Charge for renewable energy. (§§ 385, subd. (a)(2) & 399.8, subd. (b)(1).) Furthermore, the administrative procedure, tightly controlled by the PUC, describes how EPIC's revenues will be allocated. Thus, the fees charged are directly "linked to the activities" performed under EPIC and the scope of EPIC is related to the "*overall cost of the governmental regulation.*" (*California Farm Bureau*, *supra*, 51 Cal.4th at pp. 438, 440, italics added.)

SCE argues that EPIC is intended to benefit more than its ratepayers and asserts the PUC has declared that the program addresses statewide energy policy and social objectives. However, the possibility that some EPIC research may incidentally provide a social benefit to the public at large does not transform EPIC into a tax where a discrete group, namely the utility corporations' ratepayers, is specifically benefitted. (*Evans v. City of San Jose*, *supra*, 3 Cal.App.4th at pp. 738-739.) Permissible fees "need not be finely calibrated to the precise benefit each individual fee payor might derive. What a fee cannot do is exceed the reasonable cost of regulation with the generated surplus used for general revenue collection. An excessive fee that is used to generate general revenue becomes a tax." (*California Farm Bureau*, *supra*, 51 Cal.4th at p. 438.) The policy SCE cites is simply the impetus for EPIC, while the EPIC charge is designed to specifically benefit a discrete group by reducing the electricity costs borne solely by the utility corporations' own ratepayers.

Not only is the charge linked to the cost of the activity, but EPIC is not imposed to generate general revenue. (*California Farm Bureau*, *supra*, 51 Cal.4th at p. 437.) The PUC consciously sought to protect the EPIC funds "from potential diversion to other purposes unrelated to EPIC by the state budget." The PUC and the Legislature arranged for the payment of EPIC administration costs and extension of EPIC grants and loans in a manner designed to prevent diversion for general-revenue purposes. (Pub. Resources Code, § 25711.5.) Utilizing an SCE-supported proposal, funds for grants or contracts will be transferred from utility corporations to the CEC only *after* the EPIC-related

28

contract or grant has been approved by the PUC. SCE's contention is thus unavailing that there is no assurance that EPIC funds will be used solely to support RD&D with the result EPIC is a tax.[20] EPIC funds are to be used for grants or loans for renewable electricity-related research and development and administration of such grants or loans for the ratepayers' benefit. (Pub. Resources Code, § 25711, subds. (c) & (d).) EPIC revenues are not to be used for any purposes associated with publicly-owned utilities. The EPIC money is to be placed in the legislatively-created EPIC Fund for Epic-related purposes. (Pub. Resources Code, §§ 25711-25711.7.) Accordingly, as EPIC is a regulatory fee, with the result it is not a tax.[21]

b. *The separation of powers clause*

SCE next argues that EPIC violates the separation of powers clause by usurping the Legislature's taxing authority. SCE argues: "Regardless of whether Proposition 26 applies by its literal terms to the [PUC], the Court should apply its definition of tax in determining whether the [PUC], in adopting EPIC, has invaded the Legislature's exclusive prerogative to impose a tax."

The separation of powers doctrine, derived from article III, section 3 of the California Constitution,[22] "limits the authority of one of the three branches of government to arrogate to itself the core functions of another branch. [Citations.] ' "The courts have

---

[20]  In any event, at least one court has rejected the argument that a regulatory fee is converted into taxes when revenue from the regulatory fee was loaned to the General Fund. (*Tomra Pacific, Inc. v. Chiang* (2011) 199 Cal.App.4th 463, 486-489.)

[21]  Given EPIC is not a tax, the cases SCE relies for the proposition that only the Legislature is empowered to enact a tax are irrelevant. (*California State Employees' Assn. v. Flournoy* (1973) 32 Cal.App.3d 219, 234-235 [neither the executive nor the judicial branches is empowered to compel a legislative appropriation of money]; *Abbott Laboratories v. Franchise Tax Bd.* (2009) 175 Cal.App.4th 1346, 1360 [the power to tax is vested in the Legislature and courts have no power to "rewrite the statute to make it conform to a presumed intention which its terms do not express"].)

[22]  California Constitution, article III, section 3 reads, "The powers of state government are legislative, executive, and judicial. Persons charged with the exercise of one power may not exercise either of the others except as permitted by this Constitution."

29

long recognized that [the] primary purpose [of the separation-of-powers doctrine] is to prevent the combination in the hands of a single person or group of the basic or fundamental powers of government." ' [Citations.]" (*Carmel Valley Fire Protection Dist. v. State of California* (2001) 25 Cal.4th 287, 297-298.) It goes without saying that " 'the power to collect and appropriate the revenue of the State is one peculiarly within the discretion of the Legislature.' [Citations.]" (*In re Attorney Discipline System* (1998) 19 Cal.4th 582, 595.)

However, the doctrine " 'also comprehends the existence of common boundaries between the legislative, judicial, and executive zones of power thus created. [Citation.]' " (*In re Attorney Discipline System, supra,* 19 Cal.4th at p. 596.) The doctrine "recognizes that the three branches of government are interdependent, and it permits actions of one branch that may 'significantly affect those of another branch.' [Citation.]" (*Carmel Valley Fire Protection Dist. v. State of California*, *supra*, 25 Cal.4th at p. 298.) " 'The purpose of the doctrine is to prevent one branch of government from exercising the *complete power* constitutionally vested in another [citation]; it is not intended to prohibit one branch from taking action properly within its sphere that has *the incidental effect of duplicating a function* or procedure *delegated to another branch*.' [Citation.]" (*Ibid.*, italics added.) " 'The doctrine has *not* been interpreted as requiring the rigid classification of all the incidental activities of government, with the result that once a technique or method of procedure is associated with a particular branch of the government, it can never be used thereafter by another. . . ." [Citation.] [Citation.]' " (*In re Attorney Discipline System, supra,* at p. 596, italics omitted.)

The Supreme Court in *In re Attorney Discipline System*, *supra*, 19 Cal.4th 582, has already rejected the same argument raised by SCE here. The Supreme Court there imposed a fee on licensed attorneys to fund a discipline system after the governor vetoed a bill that would authorize the State Bar to collect a total of $458 per year from each attorney in 1998 and 1999, leaving only $77 in collectable bar dues annually. (*Id*. at p. 590.) The Supreme Court explained that it has the inherent judicial authority over attorney discipline, including the power to require attorneys to pay fees in support of a

30

disciplinary system. (*Id.* at p. 601.) Thus, by imposing a regulatory fee and using the State Bar's existing disciplinary structure to process disciplinary matters, the Court "would not be exercising an exclusive legislative function or usurping any legislative power." (*Id.* at pp. 602-603.) This conclusion was not affected by the fact the Legislature historically sets the amount of dues because the judiciary also has pervasive supervisory powers. (*Id.* at p. 602.) Furthermore, no statute purported to preclude the Supreme Court from imposing fees on attorneys if required to maintain an adequate attorney disciplinary system. (*Id.* at p. 606.)

Likewise here, the PUC, a constitutional body with broad legislative and judicial powers, has not usurped the Legislature's authority over appropriations and taxation. As explained, EPIC *is not a tax or an appropriation*, but a proper regulatory fee that falls squarely within the PUC's power. (*In re Attorney Discipline System*, *supra*, 19 Cal.4th at p. 595; *Sinclair Paint*, *supra*, 15 Cal.4th at p. 876.) As analyzed above, the PUC has inherent authority and "plenary power" to regulate and supervise electric corporations and to set electricity rates and assess various surcharges to fund research and development into renewable energy technology. (Cal. Const., art. XII, §§ 5 & 6.) Thus, the PUC is not exercising an "exclusive legislative function or usurping any legislative power" by imposing regulatory fees to pay for this activity. (*In re Attorney Discipline System*, *supra*, at pp. 601-603.) It makes no difference to the outcome that the Legislature was the body that originally created the Public Goods Charge because the PUC has independent authority to supervise and regulate utilities and to set rates and impose research and development fees. (See *id.* at p. 602.) Moreover, EPIC is not, as SCE insists, simply the section 399.8 Public Goods Charge reheated. EPIC is a unique program designed less expansively than the Public Goods Charge, as the latter charge finances not only renewable energy and RD&D, but also energy efficiency and conservation, and it provides state-wide, not ratepayer benefits. (D.11-12-035 at p. 21) Also, EPIC's administration and oversight are run differently than the Public Goods Charge. The projects funded under EPIC must have a nexus to ratepayer benefits; the CEC must submit an investment plan for the PUC's approval; in extending loans and

31

grants under EPIC, the CEC and the utility corporations are bound by the PUC's main and complementary guiding principles, which principles differ from those in the Public Goods Charge. In any event, the Legislature has given its imprimatur to EPIC not once, but twice.

In sum, EPIC is a lawful exercise of the PUC's authority. The PUC has not unlawfully delegated its policymaking authority. Finally, as a regulatory fee, EPIC does not violate Propositions 13 or 26 or the Separation of Powers Clause.[23]

---

**23** We have considered and rejected SCE's remaining arguments. SCE's request for judicial notice filed on February 11, 2013 is granted.

DISPOSITION

Petitions for writ of review are denied. Respondent and Real Parties in Interest are entitled to costs on appeal.


ALDRICH, J.


We concur:



CROSKEY, Acting P. J.



KITCHING, J.


33

Filed 6/18/14

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| SOUTHERN CALIFORNIA EDISON COMPANY,<br><br>　　　Petitioner,<br><br>　　　v.<br><br>PUBLIC UTILITIES COMMISSION<br><br>　　　Respondent;<br><br>NATURAL RESOURCES DEFENSE COUNCIL et al.,<br><br>　　　Real Parties in Interest. | B246782 consolidated with B246786<br><br>(Cal.P.U.C. Dec. Nos.: D.11-12-035, D.13-01-016, D.12-05-037, D.13-04-030)<br><br>ORDER MODIFYING THE OPINION AND CERTIFYING FOR PUBLICATION<br><br>[NO CHANGE IN JUDGMENT] |

THE COURT:

Good cause appearing, the opinion in the above entitled matter filed on May 28, 2014, is hereby modified as follows:

On page 1, the portion of the caption reading: "NATURAL RESOURCES DEFENSE COUNSEL et al." is amended to read, "NATURAL RESOURCES DEFENSE COUNCIL et al.".

On page 1, line 1, the sentence reading "ORIGINAL PROCEEDINGS in mandate." is modified to read: "PETITIONS for writ of review."

On page 6, line 20, beginning "contract or grant has been approved by the PUC." is modified to read, "contract or grant has been approved by the investor-owned utilities and the CEC."

On page 29, line 1, beginning "contract or grant has been approved by the PUC." is modified to read, "contract or grant has been approved by the investor-owned utilities and the CEC."

We have received multiple letters requesting that the opinion be certified for publication. It appears that the opinion meets the standards set forth in California Rules of Court, rule 8.1105(c). The opinion is ordered published in the Official Reports.

[There is no change in the judgment.]